Jack F. KITCHIN and Wilma H. Kitchin, Kitchin Equipment Company of Virginia, Inc., and Motor Crane Service Company, Inc., Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 9497.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 7, 1964.

Decided Jan. 11, 1965.

Rehearing Pending.

Fortescue W. Hopkins, Roanoke, Va. (Hopkins, Pearson & Engleby, Roanoke, Va., on brief), for petitioners.

Edward L. Rogers, Attorney, Department of Justice (Louis F. Oberdorfer, Asst. Atty., Gen., Meyer Rothwacks and Loring W. Post, Attorneys, Department of Justice, on brief), for respondent.

Before BRYAN and J. SPENCER BELL, Circuit Judges, and GORDON, District Judge.

J. SPENCER BELL, Circuit Judge:

This appeal presents the question of the proper treatment for federal income taxation purposes of certain monies accrued by the petitioners during 1958–1959. The Commissioner has determined deficiencies totalling $33,950.53 in petitioners' income tax for that period, and the Tax Court has sustained his treatment of the items in controversy.

The basic facts in this case are not in dispute; the conclusions to be drawn from those facts are vigorously contested because the resolution of the issue here involved is important to the commercial community as well as the Commissioner. Petitioners herein are three taxpayers: Jack F. Kitchin, who engaged in business under the name of Norfolk Contracting Company (apparently an unincorporated enterprise hereinafter referred to as Norfolk) and who filed a joint federal income tax return with his wife for their tax year ending December 31, 1958; Kitchin Equipment Company of Virginia, Inc. (hereinafter Kitchin Equipment); and Motor Crane Service Company, Inc. (hereinafter Motor Crane). The latter two taxpayers filed corporate tax returns for their fiscal years ending March 31, 1959; all of the outstanding corporate stock of both of them was owned by Jack Kitchin. All three taxpayers used the accrual method of accounting in computing and reporting their taxable income.

For several years prior to 1958, petitioners had engaged in the business of leasing construction equipment to contractors, either on a straight rental basis or a fully operated basis (which included an operator). None of them had at any time or in any way attempted to sell equipment to any lessee.[1] One of the principal customers of all three taxpayers was the M. W. Kellogg Company (hereinafter Kellogg), a firm which undertook major construction projects all over the United States. In February 1958, Kellogg entered into an agreement with the Kennecott Refining Company (hereinafter Kennecott) to construct a copper refining plant for it at Baltimore, Maryland, on a cost-plus basis. Among other things, the construction agreement provided that insofar as possible, all contracts by Kellogg for the use of equipment on the Baltimore project were to give Kennecott the alternative of either straight rental or rental coupled with an option to purchase under which previous payments would be applicable against a "recapture" price mutually agreed upon by Kellogg and the lessor prior to the use of the equipment and approved by Kennecott's project manager.

During the early summer of 1958, Kellogg notified the taxpayers that it desired to lease certain equipment from them for use on the Kennecott job. It advised them from the outset, however, that any equipment lease agreements would have to include the recapture option provision insisted upon by Kennecott. Although it necessitated a departure from their normal business practice, the taxpayers reluctantly agreed[2] to the

---

1. One reason for this policy was that the taxpayers received what they considered to be a valuable part of their business by referral from other companies which engaged in equipment sales to contractors but not in rentals.

2. The taxpayers consented to this arrangement because they believed that unless they did so, they would get none of the Kellogg business on the Kennecott project in Baltimore. It is uncontested that Kellogg was a very valuable, if not the principal, customer of each of the petitioners.

inclusion of the recapture option[3] in their equipment leases with Kellogg for this job, upon the condition that Kellogg reimburse them for major maintenance expenses incurred during the lease period with respect to any equipment which was eventually recaptured. Kellogg agreed to this condition, whereupon Kellogg specified the equipment it desired and the parties proceeded to negotiate for each piece of equipment a monthly payment by the lessee and a recapture price. The figures agreed upon by Kellogg and the taxpayers were subsequently approved by Kennecott.

By the end of the taxable periods at issue here, the petitioners had leased 32 pieces of equipment to Kellogg.[4] As of that time, Kellogg had neither exercised its recapture option with respect to any item of equipment nor advised taxpayers of its intention to do so. The total monthly equipment charges accrued under the Kellogg leases at that time amounted to $67,851.68.

In preparing their tax returns, the petitioners excluded the equipment payments accruing from Kellogg from their gross income; instead they transferred these items to a special suspense account to be held until they were advised by the lessee whether it intended to exercise the recapture option or let it lapse. The plan developed by the taxpayers to deal with these payments was to recognize the tax consequences of a Kellogg decision about a particular piece of equip-

ment in the taxable period during which notification regarding that piece of equipment was received.[5]

After examining the tax returns filed by the petitioners and reviewing the background circumstances, the Commissioner concluded that all the payments accrued under the lease agreements with Kellogg were rental receipts and as such were includable in gross income and taxable as ordinary income in the taxable period in which they were accrued. He therefore assessed the deficiencies which the petitioners contest, and his action was held proper by the Tax Court.

I.

An appropriate starting point in resolving the issues raised by this appeal would seem to be the decision of this court in Virginia Iron Coal & Coke Co. v. Commissioner, 99 F.2d 919 (4 Cir. 1938), cert. denied, 307 U.S. 630, 59 S.Ct. 833, 83 L.Ed. 1513 (1940). In that case, one of the taxpayer's subsidiaries owned certain mineral lands and mineral rights in Virginia in which the Texas Gulf Sulphur Company (hereinafter the Texas Company) was interested. The taxpayer and the Texas Company entered into a written agreement on July 7, 1930, which provided that the Texas Company might purchase the mineral interests for $3,750,000 at any time prior to August 1, 1935, upon payment on or before August 1 of each year of certain specified sums. All the annual payments were to be credited as part of the purchase price

3. The wording of the recapture option, as it appeared in the lease agreements with Kellogg, was as follows: "One hundred per cent of all rental monies due and/or paid on this piece of equipment is to apply against the purchase price if recapture is desired at any time during the rental period."

4. As of March 31, 1959, 27 items had been leased from Kitchin Equipment, 3 from Norfolk, and 2 from Motor Crane.

5. The record indicates that after the close of their taxable years ending March 31, 1959, but before their tax returns were due, the two corporate taxpayers learned from Kellogg that it did not intend to capture a total of five pieces of equip-

ment it had leased from them. Since the payments accrued on this equipment would unquestionably be reportable as ordinary income, they were initially included by the taxpayers in their gross income for the 1958–1959 period. Subsequently these two taxpayers amended their answers in the Tax Court proceedings, claiming that the payments on these five pieces of equipment were reportable not in the 1958–1959 tax period but in the taxable year ending March 31, 1960, and in one of the actions here on appeal, Tax Court Docket No. 93734, the taxpayer has claimed a tax overpayment. Since we are remanding this case, we leave a decision on this point to the Tax Court.

in case the purchase option was exercised; they were to be retained by the taxpayer if the option was allowed to lapse. On December 26, 1933, after having made annual payments totaling $425,000 in 1930 and 1931, the Texas Company notified the taxpayer that it would not exercise the purchase option. The taxpayer did not include any part of the annual payments received in 1930 and 1931 in its income in filing tax returns for those years; instead it in effect held these payments in abeyance until their tax character became certain. When this happened, the taxpayer filed amended returns seeking to include the payments as taxable income in the years of receipt. The Commissioner resisted this course of action and assessed a tax deficiency, contending that the option proceeds were taxable in 1933 when the option was terminated and when for the first time it was known that the option payments would be forfeited rather than serve to decrease the amount to be paid as the final purchase price. The Board of Tax Appeals found the Commissioner's treatment of the payments proper,[6] and on appeal this court affirmed, using the following language:

> "It is true that, when possible, the Federal income tax system is operated on a yearly basis. [Citations omitted.] A reading of the option discloses, however, that at the time the payments were made it was impossible to determine whether they were taxable or not. In the event the sale should be completed, the payments became return of capital, taxable only if a profit should be realized on the sale. Should the option be surrendered it would then become certain, for the first time, that the payments constituted taxable income. Thus it will be readily seen that it was impossible to tax these payments in the year in which

6. 37 B.T.A. 195 (1938).

7. 1963 P-H T.C. Memo Dec. ¶63,332.

8. In the Gilken case, however, three Tax Court judges dissented on the ground

they were made. This being true the yearly basis system could not be used." 99 F.2d at 921. See also Bourne v. Commissioner, 62 F.2d 648, 649 (4 Cir.), cert. denied, 290 U.S. 650, 54 S.Ct. 67, 78 L.Ed. 1048 (1933), cited with approval in the Virginia Coal opinion.

The principle laid down in the Virginia Coal case has been accepted and followed by both the Tax Court and courts of appeals in other circuits. See, e. g., Commissioner v. Dill Co., 294 F.2d 291, 299–301 (3 Cir. 1961), affirming 33 T.C. 196, 200 (1959); Hunter v. Commissioner, 140 F.2d 954 (5 Cir. 1944), affirming 1943 P–H T.C. Memo Dec. ¶43,277; C. V. L. Corp. v. Commissioner, 17 T.C. 812, 815–816 (1951); cf. Doyle v. Commissioner, 110 F.2d 157, 159, 130 A.L.R. 989 (2 Cir.), cert. denied 311 U.S. 658, 61 S.Ct. 13, 85 L.Ed. 422 (1940).

The Commissioner does not dispute here the validity of the Virginia Coal principle; rather he contests its applicability to the facts in the case before us. He points out that Virginia Coal and the cases which have followed it have involved a "straight option"—that is, the consideration received by the taxpayer only gave the payor the opportunity for a stated period of purchasing certain property at an agreed price (with the option payments to be credited against the purchase price if the option was exercised)—whereas the payments here secured for the payor not only the purchase opportunity (with a credit for prior payments) but also the use of the equipment in the meantime. The Tax Court was persuaded by the Commissioner's analysis and argument,[7] and it was not without authority in so deciding. Lester v. Commissioner, 32 T.C. 711, 722 (1959); Gilken Corp. v. Commissioner, 10 T.C. 445, 453 (1948), aff'd, 176 F.2d 141 (6 Cir. 1949).[8]

that the Virginia Coal decision was controlling authority. Furthermore the appellate court opinion in that case did not even mention the Virginia Coal decision (which the Tax Court had dis-

We think, however, that the factual distinction suggested by the Commissioner is a distinction without a difference and that the final result here is controlled by the rationale in the Virginia Coal decision. At the time the payments involved here were accrued, it was just as impossible to determine their character for tax purposes as it was in the Virginia Coal case, and that condition is not somehow eliminated or its effect for tax purposes destroyed because Kellogg was allowed to use the equipment covered by the options while a recapture decision was being made. Not until the occurrence of a contingency at some time in the future could it be known whether the payments made by Kellogg would be rentals or a return of capital in the form of installments on the purchase price.

This being so, we think the Tax Court was in error in distinguishing the present case on its facts from the Virginia Coal decision and ruling instead that it was governed by its own holding in the Lester case. Accordingly, the statements in its opinion that "this [for the use of the equipment] was the sole purpose of the payments at the time they were made" [9] and that "clearly here the primary purpose of the payments was as rentals for the use of property" cannot be allowed to stand.

As a specialized tribunal created expressly to resolve disputes in what is concededly a difficult and highly complex area of the law, Tax Court determinations are entitled to considerable weight and respect, and the Supreme Court has gone to some length to emphasize that appellate review of factual resolutions by that body is quite restricted by declaring that its findings of fact and factual inferences drawn therefrom must stand on appeal unless they are clearly erroneous. Commissioner v. Duberstein, 363 U.S. 278, 290–291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Rule 52(a), Federal Rules of Civil Procedure; I.R.C. § 7482(a); Wright, Federal Courts § 96, at 376–377 (1963). However, when the Tax Court either erroneously applies the correct standard of law or, as we believe it did in the present case, fails to recognize and apply the proper legal principles, its decision is subject to reversal on appeal. I.R.C. § 7482(c); Mertens, Federal Income Taxation § 51.25.

## II.

As an alternative ground to sustain the Tax Court decision regarding the payments accrued under the arrangement with Kellogg, the Commissioner in both his brief and oral argument has asserted that the claim of right doctrine is applicable in this case.[10] This doctrine stems from language used by Mr. Justice Brandeis in North American Oil Consol. v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197 (1932):

> "If a taxpayer receives *earnings* under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." 286 U.S. at 424, 52 S.Ct. at 615. (Emphasis supplied.)

tinguished on its facts); instead the Sixth Circuit affirmed the Tax Court on the so-called claim of right theory. The Lester decision does not appear to have been reviewed by the entire Tax Court membership, and it thus stands as the ruling of a single judge.

9. This statement is clearly in error, since it is undisputed that the payments had three distinct purposes: (1) compensation for use, (2) provision of a purchase option, and (3) a credit against the agreed purchase price if the lessee elected to exercise the purchase option.

10. Since it decided against the taxpayers on the theory that the Kellogg payments were rentals in the taxable period in which they were accrued, the Tax Court in its opinion did not discuss the question of the applicability of the claim of right doctrine. Because that issue has been raised before us, however, and because we think our resolution of it may assist in the final disposition of this case without another appeal, we deem it appropriate to consider and decide this point at the present time.

This doctrine was urged upon this court in the Virginia Coal case, and it was summarily rejected there with the observation that "the situation is in no way affected by the fact that the money became the property of the petitioner when received." By the same token, we do not think the doctrine requires that the payments here be reported in the tax period during which they were accrued. The claim of right doctrine has been applied to tax payments accrued by a taxpayer, in the taxable year of their accrual, where the character of those payments is fixed as *income* to the taxpayer but there is some condition or circumstance attached to them which may require that they be repaid to the immediate payor at some future time. Brown v. Helvering, 291 U.S. 193, 199, 54 S.Ct. 356, 78 L.Ed. 725 (1934); North American Oil Consol. v. Burnet, supra; Jacobs v. Hoey, 136 F.2d 954, 956 (2 Cir.), cert. denied, 320 U.S. 790, 64 S.Ct. 205, 88 L.Ed. 476 (1943); Barker v. Magruder, 68 App.D.C. 211, 95 F.2d 122, 124 (1938). The doctrine does not apply, however, where the character of the proceeds is uncertain, as it is in the present case, so that it remains undetermined throughout the taxable year in which they are accrued whether the payments will be income at all. De Guire v. Higgins, 159 F.2d 921, 924 (2 Cir.), cert. denied, 331 U.S. 858, 67 S.Ct. 1752, 91 L.Ed. 1865 (1947). The Commissioner's position in this regard is not strengthened by his emphasis upon the fact that the payments were unrestricted as to their disposition in the hands of the taxpayers, for these payments could not be taxed under the claim of right theory unless they were income and it could not be ascertained whether they would be income or return of capital until after the end of the taxable period in question. We therefore reject the Commissioner's argument that the claim of right doctrine requires that the Kellogg payments be reported by the taxpayers in their gross income for the period in question.

### III.

The Commissioner here has raised two other points not reached by the Tax Court which we think should initially be considered and decided by that body. The first is a contention that the payments from Kellogg might be considered as ordinary income to the taxpayers resulting from the sale of property held by them primarily for sale to customers in the ordinary course of trade or business. Assets of this character (held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business) are excluded from the definition of a capital asset by §§ 1221(1) and 1231(b) (1) (A) and (B) of the Internal Revenue Code of 1954 as amended, and thus proceeds derived from their sale are not entitled to the favorable capital gains treatment. In this case we think it is for the Tax Court first to determine whether the option arrangement between Kellogg and the taxpayers effected any change, for tax purposes, in the nature of their businesses.

The Commissioner's second point is that if deferral is allowed for the Kellogg payments until their character was determined, the taxpayers should likewise be required to defer depreciation deductions on each piece of equipment leased until either the option was exercised or the taxpayers were advised that there would be no recapture of that item. The Commissioner maintains that this procedure is necessary "in order to minimize the distortion of annual income which would result from the deferral of income * * *." We think the Tax Court is the body to which the Commissioner should address this contention, and we leave it for that court on remand without expressing any opinion upon it.

### IV.

The decision of the Tax Court is reversed, and the case is remanded with directions to enter such further orders not inconsistent with this opinion as may be necessary and proper.

Reversed and remanded.