**NORTHERN PACIFIC RAILWAY COMPANY, Transferee of Northwestern Improvement Company**

v.

**The UNITED STATES.**

**No. 261–63.**

United States Court of Claims.

June 9, 1967.

---

Quinn O'Connell, Washington, D. C., for plaintiff; Robert T. Molloy, Washington, D. C., attorney of record. Gerald J. O'Rourke, Jr., and Robert E. Simpson, Washington, D. C., of counsel.

Richard J. Boyle, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

DAVIS, Judge.[*]

Northern Pacific Railway Company brought this suit to recover federal income taxes of $74,608.32 and deficiency interest of $19,631.18, which it paid as transferee of Northwestern Improvement Company ("Northwestern" or "NWI"), for the final taxable year of NWI commencing January 1, 1957, plus statutory interest.

At issue in the case is whether plaintiff, as transferee and successor to its wholly owned subsidiary, NWI, is entitled under the Internal Revenue Code of 1954 to a deduction for a capital loss incurred by the transfer on December 3, 1957 of 15,000 shares of Northern Pacific stock from NWI to Cuyuna Realty Company, then a wholly owned subsidiary of NWI.

Plaintiff is a Wisconsin corporation with principal offices in St. Paul, Minnesota. It is in the business of operating as a common carrier by rail in interstate and foreign commerce, subject to the jurisdiction of the Interstate Commerce Commission. On December 20, 1957, plaintiff acquired all of the then existing assets and liabilities of NWI, a Delaware corporation, pursuant to a duly authorized plan for a tax-free liquidation of NWI which had been adopted on October 25, 1956, and carried out under the provisions of sections 332 and 334(b) of the Internal Revenue Code of 1954 (26 U.S.C. §§ 332 and 334(b) (1) (1958)). On December 18, 1956, NWI filed a certificate of dissolution with the State of Delaware which the Secretary of State of that state approved on December 21, 1956.

Cuyuna was a wholly owned subsidiary of NWI until the latter corporation was dissolved. After the dissolution of NWI, Cuyuna became a wholly owned subsidiary of Northern Pacific. The president, vice presidents, secretary, treasurer, and comptroller of Northern Pacific held the same offices in NWI and Cuyuna and were directors of all three of these corporations. Other directors of NWI and Cuyuna were also directors and/or employees of Northern Pacific. It cannot be seriously questioned on the basis of the evidence in the record that Northern Pacific had full control over the affairs of NWI and Cuyuna, and that Mr. R. S. Macfarlane, President of Northern Pacific, dominated the other officers and members of the boards of directors for the three corporations, particularly NWI and Cuyuna because some of Northern Pacific's directors did not serve as directors of these two subsidiaries.

On November 29, 1956, the Board of Directors of NWI adopted a plan of recapitalization for Cuyuna, and on the same day, Cuyuna's Board of Directors approved and accepted the plan adopted by its parent. Pursuant to this plan, NYI transferred to Cuyuna on December 21, 1956, *inter alia*, certain real property and $200,000 in cash in ex-

---

[*] We are indebted to Commissioner Franklin M. Stone from whose statement of the facts we have borrowed wholesale.

Our result is the same as his, but we place it on a different ground.

change for new stock certificates and evidences of indebtedness, plus the cancellation of old notes, stock certificates, and other evidence of indebtedness of Cuyuna.

Commencing in 1957, during the course of dissolution of NWI, Cuyuna undertook NWI's construction activities and was used as the railroad car-building subsidiary for Northern Pacific. NWI had previously been used for that purpose. One particular activity which NWI transferred to Cuyuna as a capital contribution was Program "U". This program involved the construction of 500 railroad cars, and Cuyuna acquired the project when it was approximately one-half completed. From Cuyuna's standpoint, Program "U" produced neither a profit nor a loss—it was a cost program. By a conditional sales contract dated September 1, 1957, Cuyuna sold the cars constructed under Program "U" to Northern Pacific.

During the period from 1906 through 1955, NWI acquired a total of 30,666 shares of Northern Pacific stock for cash. These shares were purchased at their fair market value as of the time of their acquisition. NWI did not acquire additional shares of Northern Pacific stock after 1955.

On November 7th and 14th, 1956, NWI sold a total of 1,000 shares of its Northern Pacific stock with a tax basis of $69,874.80 in the open market at losses totaling $31,223.89.

On November 20, 1956, the Board of Directors of NWI adopted a resolution authorizing the president or vice president of NWI "to sell at the best prices obtainable all or any part of the capital stock of Northern Pacific Railway Company registered in the name of Northwestern Improvement Co.; * * *." In conformity with this resolution, NWI sold a total of 9,600 shares of its Northern Pacific stock in 1956 and 1957, at their fair market value on the dates of the respective sales. Out of the 9,600 shares, 4,200 shares, with a tax basis of $293,704.75, were sold at various times during 1956, for losses totaling $132,079.-

13, and 5,400 shares, with a tax basis of $361,030.08, were sold at various times during 1957, for losses of $130,722.28.

On December 2, 1957, the Board of Directors of Cuyuna authorized its officers to submit and offer to NWI to purchase 15,000 shares of Northern Pacific stock then held by NWI at $35.00 per share. NWI accepted this offer on December 3, 1957, pursuant to the resolution of November 20, 1956, and then on the same day, NWI transferred 15,000 shares of Northern Pacific stock, with an adjusted tax basis of $823,433.30, to Cuyuna in exchange for $525,000, i. e., 15,000 shares at $35.00 per share—which was $298,433.30 less than NWI's adjusted tax basis. The parties stipulated that this sum of $525,000 represented the fair market value of the 15,000 shares on the date they were transferred to Cuyuna, as established by price quotations of the New York Stock Exchange.

Basically, the decision by Cuyuna to purchase 15,000 shares of Northern Pacific stock was dictated by Mr. Macfarlane, President of Northern Pacific, who, as previously noted, also was President of NWI and Cuyuna. He did not testify at the trial; however, his executive assistant, Mr. Koerper, who was a director of both NWI and Cuyuna, was present at the time the decision was made to purchase the stock and he presented testimony to the effect that he approved of Mr. Macfarlane's plan for several "business reasons" Koerper stated that the principal reason was that he felt that Cuyuna needed the shares as earning assets in its financial structure in order to build up much needed working capital. Also, he believed that it would be undesirable to permit the shares to be placed in Northern Pacific's treasury because, in the first place, the Interstate Commerce Commission could then prevent Northern Pacific from disposing of them; second, the shares could not be voted while they were treasury stock, and third, treasury shares would be subject to "after-acquired" property clauses in Northern Pacific's prior lien mortgage and general lien mortgage. Another

reason given by him was that Cuyuna still owns the stock in question. It should also be noted that Mr. Koerper acknowledged that members of the board received advice from their tax counsel and it may be reasonably assumed that, in addition to the reasons outlined above, consideration was given to the possible income tax advantages which would inure as a consequence of the proposed stock purchase.

None of the 15,000 shares of Northern Pacific stock transferred by NWI to Cuyuna on December 3, 1957, was repurchased by plaintiff, and Cuyuna was still the owner at the time of the trial on August 16, 1965. As of that date, Cuyuna had received a total of $227,100 in cash dividends on these shares, as well as stock dividends amounting to 3,000 shares, since acquisition of the shares on December 3, 1957. Cuyuna reported all such cash dividend income in its Federal income tax returns for the applicable years.

The remaining 5,066 shares of the 30,666 shares of Northern Pacific stock held by NWI as of January 1, 1956, were included among other assets and liabilities of NWI, which were transferred by it to Northern Pacific as distributions in liquidation of NWI for the years 1956 and 1957. The record is not entirely clear, but as best it can be determined, the transfer of these remaining shares occurred on December 20, 1957, and at that time they were valued on the books of NWI at $31,789.30.

NWI kept its books on the accrual method of accounting and filed its federal income tax returns for a tax year commencing on January 1. In its income tax return for the period of January 1, 1956, through December 31, 1956, NWI treated the losses resulting from the sales of its Northern Pacific stock in the open market during that year, which totaled $163,303.02, as long-term capital losses. In its return for the period of January 1, 1957, through December 20, 1957, NWI treated its transactions in Northern Pacific stock during that period in a similar manner, and reported long-term capital losses of $429,155.58.

Upon audit, the Commissioner of Internal Revenue allowed the deductions claimed by the taxpayer in its returns for the years 1956 and 1957, for losses resulting from sales of Northern Pacific stock on the open market during those years. However, the Commissioner disallowed the deduction claimed in the amount of $298,433.30, as a net long-term capital loss resulting from the transaction involving the 15,000 shares of Northern Pacific stock which NWI had transferred to Cuyuna on December 3, 1957.

Northern Pacific, as transferee of the liquidated NWI, paid the income tax deficiency of $74,608.32 and deficiency interest of $19,631.18, which the Commissioner assessed as a result of his disallowance of NWI's treatment of its reported loss in 1957 on the stock transaction between NWI and Cuyuna. Plaintiff filed a timely claim for refund with the District Director of Internal Revenue, St. Paul, Minnesota, for $94,-239.50, which claim was rejected and disallowed by the Commissioner.

■ The Internal Revenue Code allows the deduction of "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165(a).[1] The Treasury Department has filled out the standard by a regulation (Treasury Regulations on Income Tax Section 1.165–1(b)) which states (in part):

*Nature of loss allowable.*—To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and, except as otherwise provided in section 165(h) and § 1.165–11, relating to disaster losses, actually sustained

1. The restrictions on loss deductions are not pertinent to this case. The Government does not dispute that the North-

ern Pacific stock was an asset in the hands of NWI or that the stock was held for a period exceeding six months.

during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss.

Various tests have been suggested for gauging the reality of a loss said to have been suffered in a transaction by one corporation with its wholly-owned subsidiary. Some of these have been challenged as incorrect,[2] but everyone agrees that, at the least, the transaction must have been motivated by a "business purpose" before the loss can be accepted as substantive and bona fide. See Higgins v. Smith, 308 U.S. 473, 476, 60 S.Ct. 355, 84 L.Ed. 406 (1940); Moline Properties, Inc. v. Commissioner of Internal Revenue, 319 U.S. 436, 439, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943); National Carbide Corp. v. Commissioner of Internal Revenue, 336 U.S. 422, 437, n. 20, 69 S.Ct. 726, 93 L.Ed. 779 (1949); National Investors Corp. v. Hoey, 144 F.2d 466, 468 (C.A.2, 1944); Long Corp. v. United States, 156 Ct.Cl. 197, 203, 298 F.2d 450, 453 (1962).

■ We do not view the several non-tax reasons now given for the sale by NWI to Cuyuna as proper and substantial business purposes which the Internal Revenue Service and the court would have to recognize. The first is said to be the desire to place in Cuyuna's financial structure an earning asset as an investment which would produce income and build up its working capital over the years, in order to enable the company to finance its railroad car building program. This ground can be given very little weight as a motivating force. Cuyuna did not have the money to pay for the stock; it had to receive an advance of $500,000 from Northern Pacific (or some other source) before it could pay NWI $525,000 for the shares in December 1957. In return for this payment (which it had to obtain from outside its own coffers) it received only $227,100 in cash dividends by August 1965, and probably had to pay some income tax on those dividends. Plainly, Cuyuna would have been better off or at least as well off (tax considerations aside) if the stock had been contributed to it by NWI or Northern Pacific.

■ The other three reasons stated— to keep the shares out of Northern Pacific's treasury so that the ICC would not have to approve a later disposition; to allow the shares to be voted; and to keep the shares free of the lien imposed by Northern Pacific's general mortgage— all add up, when analyzed, to the prime objective of keeping control of the voting of these shares in the hands of Northern Pacific's management. The ICC regulations (I.C.C. Regulations on Transportation, 49 C.F.R. § 56.4) did not require ICC approval but merely provided for notification to the Commission of any sale; there was no external restriction on disposition. The genuineness of this "business purpose" is therefore most suspect. As for the claim that the general mortgage would impose a lien on the stock if it came into Northern Pacific's hands, there is no showing that this would be so, and it seems unlikely; in any event, the ensuing restriction on disposition (*i. e.*, approval by the mortgage trustee) would be minimal and cannot have been a serious consideration. It was true, though, that stock in Northern Pacific's treasury could not be voted, and we judge that this was the substantial non-tax factor in the decision to transfer the shares from NWI to Cuyuna rather than to allow them to fall

2. For instance, there have been attacks on the position that the claimed loss must be disallowed—even though the transaction is substantial, real, and supported by an adequate business purpose —if the taxpayer controlled and dominated the corporation which was the other party to the transaction. Mintz,

"Recent Developments in Allowance of Loss on Sales Between Controlled Companies", N.Y.U. 8th Inst. on Fed. Tax., 29, 42–44 (1950); Watts, "Tax Problems of Regard for the Corporate Entity", N.Y.U. 20th Inst. on Fed. Tax. 867, 892 (1962).

back into the Northern Pacific treasury upon NWI's liquidation.[3]

■ The difficulty is that we cannot regard this aim—the desire of Northern Pacific's management to be able to continue to vote these 15,000 shares—as an acceptable "business purpose" for the NWI-Cuyuna transaction. Neither the seller, NWI, which was in process of liquidation, nor the buyer, Cuyuna, would have any business interest of its own in keeping voting control of those shares in the management of the parent, Northern Pacific. If that was the latter's (and not just the management's) purpose, it cannot be attributed to the subsidiaries which were the only parties to the sale. Cf. Crown Cork Int'l Corp. v. Commissioner, 4 T.C. 19, 26 (1944). They are left without any non-tax objective of their own.

■ Moreover, to take account, in considering a claimed loss, of such an intra-corporate goal would be to extend too far the tax concept of "business purpose." That notion was developed primarily to assure that a transaction sought to be recognized for tax purpose would have some substantial basis other than a hoped-for tax saving. But it is not every non-tax use of a subsidiary (or related corporation) which can properly be called a "business purpose". Some non-tax aims, though they are present, must be disregarded. See Jackson v. Commissioner of Internal Revenue, 233 F.2d 289, 290–291 (C.A.2, 1956); Paymer v. Commissioner of Internal Revenue, 150 F.2d 334, 337 (C.A.2, 1945); Dudley v. Commissioner of Internal Revenue, 32 T.C. 564, 587–588 (1959), aff'd on opinion below, 279 F.2d 219 (C.A.2d 1960); Watts, "Tax Problems of Regard for the Corporate Entity", N.Y.U. 20th Inst. on Fed.Tax, 867, 877 (1962). Manage-

ment's desire to continue its power to vote the Northern Pacific stock seems to us to fall into this excluded category. That special purpose would not involve any real business activity on the part of Cuyuna itself, but simply the use of a passive Cuyuna to fulfill the Northern Pacific Management's own plans and desires. In *Jackson*, supra, the Second Circuit put the standard thus (233 F.2d at 290): "The intended or actual business functioning of the corporation itself, not the taxpayer's aim to be accomplished via the corporation, is the test."[4] The only non-tax aims to be accomplished through Cuyuna's holding of the stock would be the top management's purposes. To acknowledge a tax loss in these circumstances would not only conflict with the principle that it is the receiving company's functioning which is important; it could also foster manipulation and lead to use of the tax laws to sharpen a potent weapon in an internal struggle for power within the corporate system.

■■ Above all, this non-tax goal is hard to reconcile with the requirement that, to be recognized for tax purposes, a loss must be suffered, actually and in fact, by the taxpayer. Where management's desire to retain the power to vote a bloc of shares is the sole "business purpose" for a sale to a subsidiary, there is no such actual loss to the selling corporation. We do not consider, in this case, the broader proposition that a sale to a wholly-owned subsidiary can never lead to a loss for the parent, regardless of the transaction's business purpose, because of the parent's continuing power to dominate and control. See Higgins v. Smith, supra, 308 U.S. at 476, 60 S.Ct. 355. But a sale of stock for the very end of preserving the voting power of

---

3. In March 1961, at the annual stockholders' meeting of Northern Pacific, this stock was voted, at management's direction, in favor of a proposed merger involving the Northern Pacific, Great Northern, and Burlington railways.

4. Watts, supra, says: " 'Business purpose' refers to an intention that the cor-

poration engage in business function or activity and is not satisfied merely by a non-tax use of the taxpayer, such as concealment of property from creditors [the situation in the *Jackson* case], that does not involve corporate activity."

the parent's management is clearly one transaction in which there is no lessening in domination and control, but an effort to maintain it intact, precisely as it was. Nor, as we have seen, was there any real alteration in the corporations' economic status. On the contrary, the design was to have everything remain as before. Despite the form of a loss-sale, that is the actuality and the substance. For this specific situation, therefore, there can be no loss, under the terms of the internal revenue statute and the Treasury regulation.

The plaintiff is not entitled to recover and its petition is dismissed.