**UNITED STATES of America, Appellant,**

v.

**Robert I. INGALLS, Jr. and Mrs. Jane S. Ingalls, Appellees.**

**No. 25150.**

United States Court of Appeals Fifth Circuit.

Aug. 9, 1968.

Rehearing Denied Sept. 26, 1968.

**144**

Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Louis M. Kauder, Attys., Dept. of Justice, Washington, D. C., Macon L. Weaver, U. S. Atty., Birmingham, Ala., for appellant.

Frank Bainbridge, Walter L. Mims, Birmingham, Ala., for appellees.

Before JOHN R. BROWN, Chief Judge, BELL, Circuit Judge and HOOPER, District Judge.

GRIFFIN B. BELL, Circuit Judge.

This appeal by the United States arises out of a suit by the appellee-taxpayer [1] for a refund of $180,959.85 in income taxes and interest paid for the year 1961. The District Court, after a non-jury trial, rendered judgment in favor of the taxpayer for the sums claimed. We reverse.

The question for decision is whether the compromise of taxpayer's employment contract claim against the Ingalls Iron Works Company is legally effective to spread the proceeds of the compromise over a ten year period for income tax purposes. The proceeds of the compromise were payable over a ten year period by way of an installment discharge by the company of taxpayer's indebtedness to the company. The District Court answered in the affirmative. We disagree.

The background of this case is one of intra-family and intra-corporate litigation extending over more than a decade. The particular question presented here concerns only a part of an over-all settlement agreement reached on January 30, 1961. The thrust of the settlement was to eliminate taxpayer from all involvement in the management and ownership of Ingalls Iron Works Company, a corporation owned by taxpayer, his mother, and trustees acting for taxpayer's two daughters.

In March 1959, taxpayer entered into a contract with Ingalls Iron Works to act as its General Manager for a period of fifteen years at an annual salary of $100,000. The validity of this contract was disputed by the remaining members of the Ingalls family. They claimed that the contract was invalid and voidable by the company.

Between 1953 and 1958, taxpayer borrowed funds from the company at various times for which he executed promissory notes. The exact amount of this indebtedness was likewise disputed, but on September 24, 1958, taxpayer's entire indebtedness to the company was reflected in his note for $258,664, bearing interest at two percent per annum and which was partially secured by twelve policies of insurance. Payments on the

---

1. Robert I. Ingalls, Jr. is referred to herein as "taxpayer". Mrs. Jane S. Ingalls is a party to this action only by reason of her participation in a joint return with her husband.

note between 1958 and January 30, 1961, had reduced taxpayer's indebtedness to $228,360, as shown on the books of the company.

In the late 1950's it became apparent that some settlement of the family feud would be in the best interests of the company. Negotiations over the settlement lasted for months and finally the agreement of January 30, 1961 was reached. The agreement as it related to taxpayer had three main points. By the first, which is not here in issue, he sold all of his stock in the company to W. H. Hulsey for $3.75 million and resigned as an officer, director and employee. By the second, also not in issue, "The Ingalls Litigation" (pending and threatened in the future) was finally ended. By the third, which gives rise to the issue here presented the dispute over the fifteen year employment contract was settled.

The contract settlement was contained in one document. Under its terms the company purchased the employment contract for $228,360 payable in equal installments of $22,836 on February 1st of the ten next succeeding years and, in turn, taxpayer agreed to pay off his outstanding indebtedness to the company of $228,360 in equal installments of $22,836 on February 1st of the ten next succeeding years. The insurance policies which had served as collateral for the September 1958 note were released, the only security for the new note being taxpayer's promise to pay and the following provision: "[Taxpayer] * * * further agrees that so long as any part of said indebtedness or any interest thereon remains unpaid, the company may make the payments hereinabove agreed to be paid to him by currently crediting said indebtedness with such payments as they accrue."

Thus on February 1st of any given year one of two things would occur. Either the taxpayer and the company would exchange checks for $22,836 or the company would simply make a bookkeeping entry whereby the $22,836 owed taxpayer by the company would be credited against the taxpayer's indebtedness to the company. The former course was followed each year, and the taxpayer would have the case turn on this "reality". It is undisputed that the taxpayer will be taxed on the $228,360 income. 26 U.S.C.A. § 61(a) (12)[2] The only dispute is whether the tax is to be paid in the year of the settlement agreement or over ten years as the checks are exchanged or bookeeping entries made.

■ In Commissioner of Internal Revenue v. Court Holding Company, 1945, 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981, 985, the Supreme Court said: "The incidence of taxation depends upon the substance of a transaction. * * * To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." This court has likewise repeatedly looked to the substance of transactions rather than to their form. See, for example, Hindes v. United States, 5 Cir., 1964, 326 F.2d 150; and Reef Corporation v. Commissioner of Internal Revenue, 5 Cir., 1966, 368 F.2d 125. The substance of the instant transaction is that by the agreement of January 30, 1961, a disputed contract claim was compromised for $228,360. The payment of the compromise was the discharge at that time of indebtedness due the company by the taxpayer in the same amount.

■ The taxpayer argues and the District Court held that mutual debts do

2. § 61. GROSS INCOME DEFINED.

    (a) *General Definition.*—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

    \*      \*      \*      \*      \*

    (12) Income from discharge of indebtedness;

not cancel each other simply by operation of law, and, thus, there was no discharge on January 30, 1961. It is true that set-offs must be pleaded, but once pleaded, the set-off here would be allowed. See 3 Code of Alabama (Recompiled 1958) Title 7, § 350 and Simmons v. Williams, 27 Ala. 507, 511–512 (1855). Although the *Simmons* case involved independent debts which the court would not set-off, the court recognized that equity would set-off mutual debts where "one debt was contracted on the credit of the other." Such is the case here. Thus the formality of pleading the set-off would be the only barrier to cancellation of mutual debts contracted on the credit of each other. The agreement here eliminates even the formality of having to plead the set-off since by contract the parties agree that if the taxpayer fails to pay the company, the company is authorized to effect a private set-off by making the bookkeeping entry mentioned above. The agreement speaks for itself and makes clear that the taxpayer had to perform no additional act for the debt to be discharged. A simple bookkeeping entry by the company each February 1st was all that was necessary. The exchange of checks by the company and the taxpayer was thus an empty ritual acted out for the benefit of the Commissioner and, in reality, the taxpayer was discharged from his indebtedness on January 30, 1961.

■ Taxpayer argues and the District Court held that there was a legitimate business purpose for the transaction here; therefore, the fact that there were tax motivations should not be a material factor in determining the tax consequences of the transaction. See Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 and Williams v. United States, 5 Cir., 1955, 219 F.2d 523. There was a nontax purpose on the part of the company in reaching the general settlement but the general settlement is not the relevant focus of inquiry. The relevant focus of inquiry is the installment aspect of the contract compromise. The fact of a non-tax business purpose for a general settlement cannot insulate the general settlement's component parts from examination to see if they were drawn solely on the basis of tax motivations. No nontax business purpose is suggested by the taxpayer for the installment aspect of the contract compromise. Indeed, the record is clear that the company would have preferred not to have used the installment arrangement.

■ It should be noted also, contrary to taxpayer's assertion, that it is the motive of the taxpayer that is important in the analysis of business purpose, not the motive of the company. There is no doctrine that a taxpayer is insulated from payment of income taxes because one party to an agreement may have a nontax business purpose in yielding to tax-motivated demands on the part of some other party. Cf. Northern Pacific Railway Company v. United States (1967), 378 F.2d 686, 692, 180 Ct.Cl. 388.

The instant situation is distinguishable from the case of Estate of Lipman v. United States, 6 Cir., 1967, 376 F.2d 455. There, although stock was purchased with proceeds partly payable in the form of debt cancellation, the taxpayer entered into a covenant not to compete over the period of the payments. The Sixth Circuit held that this covenant was a continuing obligation on the part of the taxpayer, which, if breached, would have defeated the taxpayer's claim for cancellation of the debt. No such continuing obligation on the part of the taxpayer existed here.

In our view, the most closely analogous case is Williams v. United States, supra. In that case, involving a sale of standing timber, the purchaser was ready and willing to pay the entire purchase price in cash. The vendor-taxpayer, however, set up a self-imposed escrow arrangement which spread his receipt of the purchase price over several years. This was held to be a device to reduce the taxes due on the cash sale.

The taxpayer here set up the installment arrangement to reduce his taxes and for no other purpose. Hence, no sufficient business purpose appearing for the installment aspect of the contract compromise agreement, the substance of the transaction must be given effect. The substance of the transaction is that a disputed claim was settled, with payment being made by way of a discharge of indebtedness. The discharge was complete for income tax purposes in 1961. Thus the discharged indebtedness was income in 1961.

Reversed and remanded for further proceedings not inconsistent herewith.