256 So.2d 172

**STATE of Alabama**

v.

**GULF OIL CORPORATION.**

**6 Div. 65.**

Court of Civil Appeals of Alabama.

March 24, 1971.

Rehearing Denied May 12, 1971.

Douglas Arant and William L. Hinds, Jr., Birmingham, for appellee.

MacDonald Gallion, Atty. Gen., Willard W. Livingston, Asst. Atty. Gen., and Counsel, Dept. of Revenue, and William H. Burton, Asst. Atty. Gen., and Asst. Counsel, Dept. of Revenue, for the State.

BRADLEY, Judge.

The Department of Revenue of the State of Alabama (hereinafter referred to as State) on June 13, 1963 made a final assessment of state income taxes against Gulf Oil Corporation (hereinafter referred to as Gulf) in the amount of $45,146.57 for the calendar year 1959.

The deficiency assessment of state income taxes resulted from a transaction involving the sale by Gulf of certain of its

interests in the Citronelle, Alabama oil fields to Bart B. Chamberlain and George H. Jett.

The State alleges that the sale by Gulf of its interests in the Citronelle oil fields brought to Gulf $1,500,000 more than it reported in its income tax return filed with the State for the calendar year 1959.

Gulf appealed this final assessment to the Circuit Court of Jefferson County, in Equity, pursuant to the provisions of Title 51, Section 140, Code of Alabama 1940, as Recompiled 1958.

The case was submitted to the trial court on December 15, 1969, on the basis of the amended bill of complaint, answer, pre-trial order, depositions of seven witnesses, and the oral testimony of Raymond Corcoran taken in open court.

A final decree was entered by said court on April 12, 1970 in favor of Gulf and against the State, the effect of which was to set aside the final assessment made by the State on June 13, 1963.

An appeal was taken to this court from said decree on May 12, 1970.

In 1956 Gerald Waldron, through his attorney Samuel Lane of New York, filed in the U. S. District Court for the Southern District of New York, a suit against Gulf and six other oil companies under the Clayton Anti-trust Act for the sum of $109,000,000 in damages.

Waldron said in his lawsuit that the companies had agreed to boycott the sale in the United States of oil that he had obtained from Iran.

Soon after this anti-trust suit was filed, a Mr. Searls, a lawyer for Gulf, contacted Lane and suggested that Gulf be dismissed as a defendant in Waldron's anti-trust suit. Searls stated that he informed Lane that Gulf would not pay any money directly or indirectly for the dismissal of Gulf from the lawsuit.

No monetary amount for settlement was ever discussed by Gulf and Lane.

Sometime in 1957 Sterling Oil Company of Oklahoma, Inc., acting through its president, J. A. True, made some efforts toward procuring certain interests owned by Gulf in the Citronelle oil fields; and, as a part of this effort, Sterling entered into an agreement with Waldron, through his attorney Lane, wherein for a consideration, Waldron would dismiss Gulf as a party defendant from his anti-trust suit and in return, Gulf would sell to Sterling certain of its holdings in the Citronelle oil fields.

On February 19, 1959 Sterling assigned its interest in the above agreement with Waldron to Bart B. Chamberlain and George H. Jett.

Then on May 1, 1959, after much negotiation, Gulf entered into an agreement with Chamberlain and Jett to sell them certain properties in the Citronelle oil fields for 6¾ million dollars.

At the time the negotiations were going on between Gulf and Chamberlain and Jett for the purchase of Gulf's properties at Citronelle, Chamberlain was negotiating with Waldron and Lane for the release of Gulf from Waldron's anti-trust suit.

These negotiations were concluded on May 1, 1959, when Chamberlain agreed to pay $1,500,000 to Waldron in exchange for Waldron's promise to release Gulf from his lawsuit.

Chamberlain had agreed to pay the $1,-500,000 as follows: $150,000 to be paid to Waldron upon his filing a motion in the U. S. District Court for the Southern District of New York asking that Gulf be dismissed as a party defendant from said lawsuit, executing a "Covenant Not to Sue" and an "Indemnification Agreement"; and, thereafter, $150,000 was to be paid each year for a period of nine years.

Waldron, through his attorney Lane, executed the instruments required of him by Gulf, and Gulf was dismissed as a party defendant with prejudice from Waldron's anti-trust suit on May 12, 1959 by order of the U. S. District Court.

The evidence reveals that several lawyers employed by Gulf were involved in various aspects of the dismissal of Gulf as a party defendant to Waldron's suit and the sale of Gulf's properties at Citronelle to Chamberlain and Jett.

David T. Searls, while a member of a law firm in Houston, Texas, represented Gulf in the Waldron litigation and first approached Lane about dismissing Gulf as a party defendant in said litigation. However, it was much later, and after Searls became a fulltime employee of Gulf in Pittsburg, that the negotiations for dismissal of Gulf from Waldron's anti-trust suit were finalized. Even then, the instruments required to be signed by the parties to the litigation were prepared by Raymond Corcoran, a lawyer in Gulf's law department at Houston, and Frederick L. Scofield, an attorney for Gulf in New York; although the documents prepared by these two lawyers were finally approved by Searls.

Searls stated that no amount of money was paid by Gulf to Waldron or offered to Waldron for the dismissal of Gulf from his lawsuit.

Searls further stated that he knew nothing about Gulf's sale of properties in Citronelle to Chamberlain, nor about Chamberlain's negotiations with Lane and Waldron to obtain Gulf's dismissal from Waldron's anti-trust suit.

Yet, Corcoran, who was involved in the dismissal of Gulf from Waldron's lawsuit, stated that the dismissal of Gulf from the lawsuit was a "part of the transaction." Mr. Chamberlain testified that he also understood that this was Gulf's requirement, i. e., that Gulf must be released from Waldron's lawsuit before it would sell its Citronelle properties to Chamberlain and Jett.

Lane wrote a letter to Scofield on May 1, 1959, in which he enclosed the documents required of Waldron by Gulf, and stated in said letter that Scofield was to hold all of said documents in escrow until Chamberlain paid Lane the first installment on the $1,500,000 which would be $150,000. Scofield agreed to this arrangement. The money was paid on that day, and Gulf was dismissed from the lawsuit on May 12, 1959, by order of the District Court.

Mr. Corcoran, the lawyer who was helping with the Waldron litigation, also introduced Mr. Chamberlain to the executives in Gulf's production department at Houston, with whom Mr. Chamberlain later negotiated for the purchase of certain properties belonging to Gulf in the Citronelle oil fields.

During the taking of Corcoran's deposition, there was testimony by him as to the requirement of Gulf that it be dismissed as a defendant from Waldron's anti-trust suit simultaneously with the sale to Chamberlain and Jett of certain of its holdings in the Citronelle field; and, in support of this testimony, a letter from Corcoran to Chamberlain and Jett was introduced into evidence as an exhibit to the deposition and the import of the letter was that the sale of Gulf's Citronelle properties was "conditioned upon the execution of the instruments listed in that certain letter from Samuel M. Lane to Raymond Corcoran dated March 22, 1958, * * *" said instruments having been heretofore referred to and all pertaining to the dismissal of Gulf from Waldron's anti-trust suit.

The issue in this case as raised by the assignments of error, therefore, is whether or not Gulf is liable for the income tax assessment levied against it by the State, which said assessment was based on the payment of $1,500,000 to Waldron by Chamberlain and Jett to obtain Gulf's release from Waldron's anti-trust suit.

The State contends that the $1,500,000 which was paid to Waldron by Chamberlain and Jett to obtain Gulf's release from Waldron's lawsuit was part and parcel of the sale to Chamberlain and Jett by Gulf of certain of its interests in the Citronelle oil fields.

In propounding such a contention, the State relies principally on the testimony of

Corcoran and Chamberlain that the release of Gulf from Waldron's lawsuit was, if not a pre-requisite, a co-equal requisite, to the sale by Gulf of its interests in certain properties at Citronelle. This testimony is supported by written evidence.

Gulf's contention, on the other hand, appears to be that no taxable income inured to it by reason of the payment of the $1,500,000 to Waldron by Chamberlain and Jett to obtain Gulf's dismissal from Waldron's anti-trust suit.

Gulf said that its dismissal from the lawsuit had nothing to do with the sale of certain of its oil properties at Citronelle to Chamberlain and Jett; and that it had no knowledge of the amount of money being offered to Waldron for the release of Gulf from his lawsuit, i. e., Gulf wanted to be released from the anti-trust suit, but it would not pay any money for such a dismissal and the amount of money asked for the sale of certain of its properties at Citronelle to Chamberlain and Jett would not be affected by its dismissal from Waldron's anti-trust suit.

As we understand Gulf's argument, there was no benefit received as a result of being dismissed as a defendant in Waldron's lawsuit, and, in fact, Gulf contends that it had no knowledge of the amount agreed to be paid for its release from said lawsuit.

It is also contended by Gulf that the $1,500,000 paid to Waldron by Chamberlain and Jett was in the nature of a finder's fee or commission for helping persuade Gulf to sell certain of its oil properties at Citronelle to Chamberlain and Jett.

The question presented to this court for answer is apparently a novel one.

Both parties to this appeal state that they were unable to find any cases with a factual situation on all fours with the facts in the case at bar, but they did cite us to several cases, the holdings of which were urged as decisive of the question here presented.

Title 51, Section 384, Code of Alabama 1940, as Recompiled 1958, provides in pertinent part as follows:

"The term 'gross income' as used herein: (1) Includes gains, profits and income derived * * *, also from interest, royalties, rents, dividends, securities or transactions of any business carried on for gain or profit *and the income derived from any source whatever,* * *." (Emphasis supplied.)

Alabama's Income Tax statutes are similar to the federal tax statutes, and in many instances were actually copied from the federal tax statutes, and our Supreme Court has held that where our statutes have been patterned after federal statutes, federal court construction of those federal statutes would be persuasive in a construction of our statutes. State v. Flenner, 236 Ala. 228, 181 So. 786.

Section 384, supra, which defines "gross income" for income tax purposes, was copied from what is now the federal statute defining gross income for federal income tax purposes [see 26 U.S.C.A., Sec. 61], although since that time this statute has been amended and simplified.

As a general proposition, the federal courts have held that taxable income is not realized by a taxpayer upon the cancellation of a purely "contingent" liability. Terminal Investment Co. v. C.I.R., 2 T.C. 1004; Central Paper Co. v. C.I.R., 158 F. 2d 131 (6th Cir.).

One of the most often cited cases for the above proposition, the case of United States. v. Kirby Lumber Co., 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131, held that taxpayer, Kirby Lumber Co., purchased and retired some of its bonds at a price less than the issuing price or face value, the excess thereof over the purchase price being gain or income for the taxable year. The court stated in its opinion:

"As a result of its [Kirby's] dealings it made available $137,521.30 assets pre-

viously offset by the obligation of bonds now extinct. * * * The defendant in error has realized within the year an accession to income, if we take words in their plain popular meaning, as they should be taken here."

Further, in the case of Helvering v. American Dental Co., 318 U.S. 322, 63 S.Ct. 577, 87 L.Ed. 785, the Supreme Court was faced with a situation where the taxpayer's creditor cancelled certain interest-bearing notes and also some owed back rent, accepting as payment therefor a lesser sum. The Supreme Court in Helvering v. American Dental Co., supra, and citing with approval United States v. Kirby Lumber Co., supra, stated:

> "In fields closely related to the cancellation of indebtedness which we are considering here, this Court has treated *gains in net assets* as income. * * * It was held taxable on the *increase in net assets* which resulted." (Emphasis added.)

■ From these last two cited cases it may readily be seen that one of the tests for realization of taxable income in general is an *increase in net assets* to the taxpayer.

Similarly, in Terminal Investment Co. v. C.I.R., 2 T.C. 1004, the tax court had to determine whether taxable income was realized wherein the corporate taxpayer in reorganization proceedings purchased its outstanding bond obligations at less than their par value, along with unmatured noncumulative, nondetachable script certificates, the latter being payable out of net earnings.

The tax court cited United States v. Kirby Lumber Co., supra, distinguishing the same as follows:

> "In the *Kirby* case the obligation was fixed and not contingent as here and the principle of the *Kirby* case was recognized by petitioner here when it reported as income the difference between the cost and par value of the bonds."

The court stated that the treasury regulations have required that the "indebtedness" being cancelled be, "an obligation, absolute and not contingent." The court also stated that the test of taxability as set out in *Kirby*, supra, and later emphasized in *American Dental Co.*, supra, further limits the taxability of sums resulting from the cancellation of an indebtedness in that the cancellation of said indebtedness must result in an "increase in net assets" to the taxpayer.

The same idea was stated another way in the case of Corporacion De Ventas, De Salitre y Yoda de Chile v. C.I.R., 130 F.2d 141 (2nd Cir.), wherein the court stated:

> "If the cancellation of indebtedness results in income on the theory that thereby assets are freed for the debtor's general use, it appears self-evident that the obligation to be retired must be one which unconditionally subjects the obligor's assets to liability for the payment of a fixed amount."

■ Therefore, the obligation or debt must be "fixed" in order that it can be determined that assets of the debtor are freed for the debtor's general use, thereby causing an "increase in net assets" to the debtor. American Dental Co., supra; Corporacion De Ventas, supra.

Furthermore, in dicta in the case of Ingalls v. United States, 272 F.Supp. 10 (N.D.Ala.), reversed on a contrary finding of fact, 399 F.2d 143, cert. den. 393 U.S. 1094, 89 S.Ct. 865, 21 L.Ed.2d 784, the District Court in speaking of a compromise settlement of a disputed suit on a "fixed obligation," stated:

> " * * * other principals of law applicable to the case at bar are * * * (1) The compromise and settlement of claims in dispute does not give rise to taxable income. Mertens Law of Fed. Income Taxation, Vol. 2, § 11.19 p. 71. (2) There is no income unless and until there has been a release of liability. Mertens, su-

pra. (3) When a taxpayer is not enriched taxable income does not result. Mertens, supra. * * *"

■ Although the above cited cases are concerned with federal income tax arising under the federal tax statutes and regulations, it is clear that Alabama will give due weight and consideration to federal interpretations placed on like provisions found in the Alabama tax statutes.

Regulation 384.1, applying Title 51, sec. 384(1), in pertinent part, is as follows:

"The term gross income is very broad and comprehensive. It means all wealth flowing to the taxpayer other than return of his capital. * * *

"The Federal Internal Revenue Code contains provisions similar to those of 384(1), and decisions and interpretations of the Federal courts and agencies will be given due weight in interpreting this section."

Regulation 384.1 is the same in all material respects as it was in 1959, the taxable year in question.

■ The evidence in the case at bar readily reveals the desire on the part of Chamberlain and Jett to buy certain of Gulf's interests in the Citronelle oil fields and their unrelenting efforts to achieve this goal. By the same token, the record reveals that Gulf had been attempting to persuade Waldron to dismiss it from his anti-trust suit for sometime.

The negotiations by the parties seeking a solution to these two goals finally jelled when Gulf informed Chamberlain and Jett that it would sell certain of its oil properties in Citronelle to them provided they were able to obtain Gulf's release from Waldron's anti-trust suit.

Chamberlain and Jett accepted this condition and obtained Gulf's release from Waldron's anti-trust suit by paying to Waldron on behalf of Gulf $1,500,000.

Gulf was released from Waldron's suit, and Gulf sold to Chamberlain and Jett certain properties in Citronelle. The total cost to Chamberlain and Jett of the purchase of the properties in Citronelle, including the release of Gulf from Waldron's suit, was 8¼ million dollars.

Gulf says it only realized 6¾ million dollars from the sale of these properties to Chamberlain and Jett, and that the sale price of the properties at Citronelle was not affected by the amount of money paid by Chamberlain and Jett for its release from Waldron's anti-trust suit, because it had no knowledge of the amount asked or offered for its dismissal. The sale of the properties at Citronelle was based on what could be obtained for them by hard negotiation.

The question thus presented is whether Gulf received taxable "income" within the meaning of Section 384, and Regulation 384.1, supra, as a result of its dismissal from Waldron's anti-trust suit, and the payment therefor by Chamberlain and Jett.

The federal tax cases that have considered the question of taxable benefits accruing to one who settles a claim or a lawsuit involved situations where there were fixed obligations, such as notes, bonds and other forms of indebtednesses; also, in many of these cases, claims had been reduced to final judgment, and the settlements were a compromise of these judgments.

Waldron's lawsuit against Gulf was not for some debt allegedly owed to Waldron by Gulf—it was an anti-trust suit seeking damages for an alleged boycott of the sale by Waldron of oil purchased in Iran.

There was no indebtedness involved here, and no obligations extant that Gulf might be held responsible to satisfy.

At the most, we could only say that Gulf might be found guilty of the charges made by Waldron at some future time when and if Waldron's lawsuit was reduced to judgment in his favor, and at such time, and

only if the above supposition materialized, would Gulf become indebted or obligated to Waldron in some amount.

However, at the time Gulf was dismissed from Waldron's lawsuit, there was no judgment outstanding against Gulf, nor had the case even progressed to the trial stage; therefore, we are unable to perceive that Gulf was indebted or obligated in any way to Waldron at the time of the dismissal of Gulf from his lawsuit. And, there being no compromise of some part of an indebtedness or obligation owed by Gulf to Waldron, there could be no taxable income accruing to Gulf by Chamberlain and Jett's payment of $1,500,000 to Waldron to release Gulf from his lawsuit because there was no "increase in assets" of Gulf due to such payment, for the evidence shows that 6¾ million dollars was the top price for the sale of the Citronelle oil properties realized by Gulf.

Particularly do we conceive this proposition to be valid when we consider the evidence, which was undisputed, that the sale of the Citronelle oil properties by Gulf was without knowledge of the amount Chamberlain and Jett had agreed to pay Waldron for Gulf's release from his lawsuit. In other words, the payment to Gulf of 6¾ million dollars for the Citronelle oil properties represented the worth of those properties to Gulf without any other considerations, such as the $1,500,000 payment to Waldron by Chamberlain and Jett ostensibly on Gulf's behalf.

Consequently, there was no taxable income realized by Gulf as a result of the payment to Waldron by Chamberlain and Jett of the $1,500,000 even though Gulf was released from Waldron's lawsuit, for that Gulf's release resulted in the cancellation of a purely "contingent" liability so far as Gulf was concerned.

The holdings in the cases cited and relied on in brief by appellant are not contrary to the results obtained in the above cited cases.

The decree of the trial court finding in favor of Gulf and setting aside and holding for naught the final assessment made against it by the State on June 13, 1963 for an alleged income tax delinquency occurring in the calendar year 1959 is affirmed.

Affirmed.