John W. and Marie B. DILLIN, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 28108.

United States Court of Appeals, Fifth Circuit.

Oct. 14, 1970.

Rehearing Denied Nov. 13, 1970.

Michael L. Kinney, Sherwin P. Simmons, Albert C. O'Neill, Jr., Fowler, White, Collins, Gillen, Humkey & Trenam, Tampa, Fla., Daniel Mungall, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for plaintiffs-appellants.

John L. Briggs, U. S. Atty., Tampa, Fla., Rodger M. Moore, Atty., Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Janet R. Spragens, Harry Baum, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before PHILLIPS*, BELL and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

The Dillins appeal from a judgment entered on a jury verdict, which held that

---

* Of the Tenth Circuit, sitting by designation.

$99,250 received by Mrs. Dillin in 1961 was not a loan repayment and was properly taxed as a dividend.[1] The husband is a party by reason only of signing a joint return. Hereinafter, "appellant" or "taxpayer" refer to Mrs. Dillin or to the couple jointly, as the context requires.

Appellant is one of four children born to Emma and Phillip Baur. Phillip was co-founder of the Tasty Baking Company (TBC), and his family owned 50% of the stock. When he died in 1951 a management impasse arose between the Baur family and the Morris family, owner of the other half of TBC. In 1953, Herbert Morris offered to sell 800 shares of TBC to the Baur family at $1,000 a share. Phillip Baur's testamentary trust agreed to buy 400 shares, and the four Baur children plus Paul Kaiser, husband of Louise Baur Kaiser, agreed to buy the remaining 400 shares.

Tasty Holding Company (THC) was formed to hold the children's 400 shares, Kaiser and the family lawyer having decided that this provided the best means for retaining control of TBC. THC issued 400 shares to the four Baur children for the aggregate consideration of $500.

THC, on June 2, 1953, bought the 400 shares of TBC from Herbert Morris, using $400,000 borrowed from the Fidelity Bank at 3½% interest and payable on demand. Fidelity apparently made the loan in anticipation of handling more of TBC's business. As TBC had other banking ties, Kaiser decided to pay off the loan to Fidelity immediately.

On June 19, 1953, Emma Baur loaned THC $200,000 on open account. THC used the $200,000 plus four promissory notes to discharge its obligations to Fidelity. The same day, Kaiser and the four Baur children paid the bank $200,661.11, and were assigned the notes obligating THC. Each child, including the taxpayer, held one of the four equal notes.

From 1954 to 1961, Emma Baur assigned parts of the $200,000 THC obligation, in $3,000 parcels for gift tax reasons, to the children and Kaiser. Appellant was assigned $49,250 of the open account indebtedness, and was thus owed a total of $99,250 by THC.

THC, with its only income from dividends and its only assets TBC stock, was characterized for tax purposes as a personal holding company. It distributed all the dividend income to the five (including Kaiser) stockholders to avoid the heavy tax levied on undistributed personal holding company income. (I.R. C., Sec. 541)

By 1961, through two stock splits and a reorganization the 400 shares had become 72,000 shares of non-voting stock and 8,000 shares of voting stock. In late 1961, THC made a public offering of 40,000 non-voting shares. THC then used $400,000 of the $529,048 net sales proceeds to pay off the obligations held by the Baur children and Kaiser. No interest on indebtedness was paid. The appellant recovered $99,250, claiming that it represented a tax free repayment of debt, rather than a taxable dividend. The government contends that this event resulted in the acquisition by the taxpayer of taxable dividend income.

The problem of determining, in the context of the Internal Revenue Code and modern business relations, what constitutes an equity interest and what constitutes a debt interest has been a matter of continuing concern for the courts.[2] This case is no exception.

■ In Montclair, Inc. v. Commmissioner of Internal Revenue, 5 Cir. 1963, 318 F.2d 38, at page 40, we attempted

---

1. The applicable dividend provision is Section 301 of the Internal Revenue Code.

2. Recent Fifth Circuit cases alone include: Tyler v. Tomlinson, 5 Cir. 1969, 414 F.2d 844; Berkowitz v. United States, 5 Cir. 1969, 411 F.2d 818; Harlan, et al. v. United States, 5 Cir. 1969, 409 F.2d 904; Tomlinson v. 1661 Corporation, 5 Cir. 1967, 377 F.2d 291; United States v. Henderson, 5 Cir. 1967, 375 F.2d 36.

to list some of the guiding considerations in deciding debt-equity cases:

> "(1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) 'thin' or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of 'dividend' money; (11) the ability of the corporation to obtain loans from outside lending institutions." [3]

In applying these factors, each case must be decided on its own unique fact situation and no single test is controlling. Berkowitz v. United States, 5 Cir. 1969, 411 F.2d 818; Harlan, et al. v. United States, 5 Cir. 1969, 409 F.2d 904; Tomlinson v. 1661 Corporation, 5 Cir. 1967, 377 F.2d 291. Judge Goldberg has said for us that the Court rejects the thought that these tests are "talismans of magical power," and the most that can be said is that they prove a source of helpful guidance. Tyler v. Tomlinson, 5 Cir. 1969, 414 F.2d 844, 848.

A question preliminary to a consideration of the merits is whether this case was properly submitted to a jury. The appellant contends that the district court erred in sending the case to a jury since the operative facts are undisputed; she asserts that in this posture the case should have been decided by the court as a matter of law. *Berkowitz,* supra. While some dispute exists over the matters of the intent of the parties at the time these transactions occurred and the

proper determination of the actual operating debt-equity ratio of the corporation, the facts are otherwise totally stipulated. As we said in United States v. Snyder Brothers Company, 5 Cir. 1966, 367 F.2d 980, 982–983, cert. denied 386 U.S. 956, 87 S.Ct. 1021, 18 L.Ed.2d 104:

> " * * * the problem is not one of ascertaining intent since the parties have objectively manifested their 'intent.' It is a problem of whether the intent and acts of these parties should be disregarded in characterizing the transaction for federal tax purposes."

Thus in these debt-equity cases, if the other operative facts are undisputed, the existence of disagreement over the intent of the parties is not a barrier to determination of the issue as a matter of law. With regard to the debt-equity ratio question, the amounts attributable to each category as reflected on the corporate books ($400,000 debt—$500 equity) were undisputed. The controversy arose over whether for purposes of this litigation the debt-equity ratio should be computed by considering the equity amount as listed on the corporate books or by reference to the actual market value of the assets. In this situation we are of the opinion that establishing the standard and thus the proper debt-equity ratio was a matter of law. However, it is arguable that the case should have been submitted to the jury on the limited issue of establishing the proper value of the assets, and in view of the fact that the trial judge instructed the jury that they should look to actual market value in order to establish the debt-equity ratio, for purposes of this appeal we have given the appellant the benefit of the doubt and have assumed that appellant's estimation of the debt-equity ratio is correct. With

3. This listing is certainly not all-inclusive, and courts have looked to other relevant indicia to determine whether the relationship is that of a capital contributor or a creditor. See United States v. Henderson, 5 Cir. 1967, 375 F.2d 36; Janeway v. Commissioner of Internal Revenue, 2 Cir. 1945, 147 F.2d 602; Commissioner of Internal Revenue v. Meridian & Thirteenth Realty Company, 7 Cir. 1942, 132 F.2d 182. In a recent article the author asserts that at least thirty-eight different factors have been used by the courts to determine this issue. Holzman, The Interest-Dividend Guidelines, 47 Taxes 4, January, 1969.

that reservation, we are generally of the opinion that the district court improperly submitted the case to the jury. *Berkowitz,* supra.

■ The appellant also contends with great vigor that this is not a typical debt-equity case for two major reasons: (1) the initial transaction with Fidelity Bank was a bona fide transaction, and it retained that characterization when the promissory notes were later transferred for consideration to the stockholders of THC, and (2) this case involves a personal holding company, and because a holding company is uniquely designed to hold other property and not primarily to conduct profit-making operations, the traditional rules for evaluating and characterizing the advance of funds cannot properly be applied to such a company. We agree that these unusual circumstances may alter the emphasis placed on certain criteria which are traditionally involved in such decision-making. We fail to see, however, why these guidelines, imperfect as they may be, will not suffice in this case.

We turn to the merits. There was testimony at the trial by a bank officer and Kaiser that the initial loan made by the bank was a bona fide business deal and not part of some larger plan to convert the notes into the hands of the stockholders. Apparently the bank anticipated future business from the Baur family when it made the loan. It seems that the family was not equally enamored with the bank and upon learning of the bank's design they decided to pay off the loan. Therefore some seventeen days after the initial bank loan Mrs. Emma Baur advanced $200,000 to the corporation on open account, and the stockholders of THC obtained the additional $200,-000 needed to pay off the bank and to take possession of the four THC promissory notes. Although it strains coincidence that the four notes held by the bank and obtained by the THC stockholders precisely matched the stockholders' pro rata holdings in THC (a factor which might indicate that the Baurs intended

to put their money at the "risk of the business." Tyler v. Tomlinson, supra), at this point the dealings admittedly resemble a bona fide loan transaction. In saying this we do not mean to imply that a transaction which initially takes on the appearance of a legitimate loan may never later become an equity interest because of subsequent developments. Such a declaration would create a tax loophole the dimensions of which would make the tax bar drool and Internal Revenue officials cry in their Codes.

■ It was stipulated that all of the transactions were reflected on the THC books as loans or accounts payable, and that the notes were not subordinated to the claims of any general creditors of the corporation but that the holders were on an equal status with other creditors. While it was stipulated that the notes did not give the holders any right to participate in the management of the corporation, this indicator must be discounted because the holders also held stock in like proportions and therefore any voice in the management could be equally exercised through the stock holdings.

Although it was stipulated that the promissory notes were drafted in the standard form, giving the holders the right to enforce payment of principal and interest, the government makes much of the contention that in reality the notes had no definite maturity date and no definite obligation to repay, highly significant features of a debtor-creditor relationship. The notes were demand notes. However, all payment was deferred until it was possible for the corporation to go "public" and pay off the obligations without any adverse effects on THC or impairment of the Baurs' controlling interest. Furthermore, at least to the extent that the obligations were owned and assigned by Mrs. Emma Baur, they could not be enforced without majority approval. The government asserts that the cumulative effect of these developments virtually eliminates creditor safeguards, and that such a series of events would have only occurred where the parties were motivated by corporate,

not creditor, considerations. The government's claim is convincing.

It is of further significance that Mrs. Emma Baur, who made the initial $200,000 open account loan to THC, was careful to distribute this obligation to the THC stockholders so that each shareholder's pro rata purported debt holdings continued to match his pro rata stock holdings. Also, Emma Baur entered into an agreement with the holders of the notes that she would not institute legal proceedings for non-payment on the $200,000 she advanced on open account unless such action was agreed upon by the holders of a majority of the notes. Thus even though there was not a unity of the stockholders and those purporting to hold debt interests until Mrs. Baur completed her gift-giving program, this agreement effectively put the control over any foreclosure for non-payment in the hands of the stockholders. Obviously these developments give the advances a shading more akin to an equitable interest.

The stockholders also waived any interest payments on the 3½% interest promissory notes, ostensibly for the reason that the interest if accepted would have been subject to the Pennsylvania personal property tax. Appellant contends that the absence of interest was not due to any lacking of the character of indebtedness but rather a pure economic decision made after the debt was created. Foregoing of substantial interest payments is not something that the normal creditor would allow, and regardless of appellant's motive, it is a factor which points toward equity.

Other relevant factors are the extent to which the advances were used to purchase capital assets. It is undisputed that all of the advances went to purchase the one asset of THC, that being the stock in TBC. Appellant asserts that these indicators are totally unre-

liable when applied to a holding company, for a holding company generally conducts no actual profit-making operations and therefor has no need for large capital assets other than the stock of the company it holds. While we recognize the functional distinction of a holding company, and the import of the appellant's argument, we perceive no reason why these traditional indicators should not be observed for whatever help they may lend in establishing the overall picture. Cf. Ogden Company v. Commissioner of Internal Revenue, 1 Cir. 1969, 412 F.2d 223.

The government contends that the proper debt-equity ratio, valuing the stock at the book value of $1000 per share, is 800:1. The appellant argues that the stock had a market value of $1,390 and that therefore the debt-equity ratio is overstated. The trial judge in this case instructed the jury that they should look to the actual market value of the assets. In this case the actual public sale of the stock seems to bear out the appellant's contention that the value of the stock was substantially in excess of $1,000. The traditional accounting view is that assets should be reflected at book value. Assuming arguendo, as we do, page 6 supra, that the appellant in this case has correctly valued the assets at market value, the corporation's debt-equity picture is at best 2.5:1.[4]

Appellant also argues that the present factual situation does not frustrate federal tax policy, and therefore the intent of the parties should not be disregarded. The argument proceeds in this manner: The federal tax policy in debt-equity cases is to prevent dividend income from being siphoned off as return of capital and interest. However, this is not a worry with personal holding companies because their sole source of income is derived from dividends from the stock they hold. Because of the burdensome tax on undistributed personal holding

4. This figure is arrived at through the following computation: 400 shares at $1390 per share equals $556,000. On this basis the total assets of the corporation were $556,000 with a debt of $400,000. Thus the stockholders had an equity of $156,500, or a debt-equity ratio of approximately 2.5:1.

company income a holding company is forced to distribute any income which it receives. Moreover, appellant argues that utilization of the holding company concept caused 15% of the dividends which passed from TBC to THC to the stockholders to be taxed twice. (I.R.C. § 243). Thus all ordinary profits of the company were paid and taxed as dividends each year. Appellant seems to be arguing that since taxes have been paid on dividends received yearly from operating profits she should now be rewarded by receiving debt treatment on profits which the holding company realized from sale of stock which it held. We think that appellant's conclusion does not follow from the premise, and that this reasoning is generally unsound. Moreover, if appellant incurred an additional 15% dividend tax as a price for the added family control which a holding company provided, that was her choice.

 The ultimate question presented here is whether the investment, analyzed in terms of economic reality, constitutes risk capital subject to the fortunes of the venture, or whether it represents a strict debtor-creditor relationship. In this regard, transactions between a family corporation and its shareholders are subject to special scrutiny, particularly where the shareholders actively participate in the management of the corporation. Fin Hay Realty Company v. United States, 3 Cir. 1968, 398 F.2d 694. In this case the family relationships with the corporation are many. The baking company appears to have been a life-long interest of and provider of income for the family, and they rightfully had a strong desire to maintain it as a going concern within the tight control of the family. These are all valid considerations which might motivate a stockholder in a family corporation. While the original loans contracted from the Fidelity Bank and Mrs. Baur may have been legitimate debt interests at the time they were created, it abundantly appears that when these obligations were subsequently transferred into the hands of the stockholders they proceeded to

treat these interests in a manner much more characteristic of corporate stockholders than arm's-length creditors concerned for the advanced principal and the interest to be returned on the capital advanced. The appellant advanced capital with controls normally attributed to a stockholder, and yet here requests a safe tax harbor by calling the advance a debt. We feel inclined in this baking case to say that the appellant wants to "have her cake and eat it, too." This she cannot do. Considering the total circumstances of this suit, we think that in the hands of the appellant these interests were equitable in nature, and therefore the distributed $99,250 was a distribution of earnings subject to dividend taxation.

Affirmed.

## ON PETITION FOR REHEARING

PER CURIAM:

Upon consideration of the petition for rehearing filed in the above-entitled and numbered cause it is ordered that the paragraph beginning on p. 1102 is withdrawn and the following language is substituted therefor:

It is of further significance that Mrs. Emma Baur, who made the initial $200,000 open account loan to THC, was careful to distribute this obligation to the THC stockholders so that each shareholder's pro-rata purported debt holdings continued to match his pro-rata stock holdings. Also, Emma Baur entered into an agreement with the holders of the notes whereby the holders agreed not to institute legal proceedings for non-payment on the $200,000 she advanced on open account unless such action was agreed upon by the holder of a majority in interest of the total open account. Even though Mrs. Baur maintained a majority in interest of the open account until January 19, 1961, and there was not a unity of the stockholders and those purporting to hold debt interests until Mrs. Baur completed her gift-giving program, this agreement effectively placed the control over any foreclosure for non-payment in the hands of Mrs.

Baur, the wife of the founder of TBC, and ultimately in the stockholders. We think that these arrangements to prevent the collection on the open account by an individual holder, in the overall context, give the advances a shading more akin to equitable interests in the hands of the stockholders.

Neither this substitution nor any other matter raised in the petition for rehearing alters the original decision reached by the Court.

The petition for rehearing is accordingly denied.