REPUBLIC SUPPLY COMPANY, A DELAWARE CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6164-73.    Filed June 14, 1976.

---

*Julian P. Kornfeld, T. Ray Phillips III,* and *Tom G. Parrott,* for the petitioner.

*James D. Thomas,* for the respondent.

OPINION

STERRETT, *Judge:* The respondent determined a deficiency in petitioner's Federal income tax for the taxable year 1969 in the amount of $184,914.56. One issue having been settled the sole remaining issue is whether petitioner realized additional income of $318,108.99 upon the expiration of an agreement with Tascosa Gas Co., and if so, whether such income was realized in 1969 or 1970.

All of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. This case was submitted by the parties for decision under Rule 122 of this Court's Rules of Practice and Procedure.

Petitioner was originally incorporated under the laws of Delaware as Kermac Corp. on March 30, 1948, and then changed its name to Republic Supply Co. on April 19, 1948. For convenience Republic Supply Co. (Delaware) will hereinafter be referred to as the petitioner or Kermac.

Petitioner, as noted a corporation organized and existing under the laws of Delaware, had its principal place of business in Oklahoma City, Okla., at the time of filing its petition herein. Petitioner filed its corporate Federal income tax return for the taxable year 1969 with the Director, Internal Revenue Service Center, Southwest Region, Austin, Tex. For Federal income tax purposes, petitioner employs the accrual method of accounting. Petitioner's principal business is the sale of oil field tubular goods and other oil field products.

On April 3, 1948, April 20, 1948, and December 22, 1949, all of the common stock of petitioner was owned as follows: [1]

| Shareholder | 4/3/48 | | 4/20/48 | | 12/22/49 | |
|---|---|---|---|---|---|---|
| | Number of shares | Percent of shares | Number of shares | Percent of shares | Number of shares | Percent of shares |
| R. S. Kerr | 13,600 | 54.4 | 6,250 | 25 | 12,500 | 25 |
| D. A. McGee | 8,087.5 | 32.35 | 7,168.75 | 28.68 | 14,337.5 | 28.68 |
| F. C. Love | 250 | 1 | 250 | 1 | 500 | 1 |
| T. M. Kerr | 1,701.4 | 6.81 | 851.4 | 3.41 | 1,702.8 | 3.41 |
| T. W. Fentem | 850.575 | 3.4 | 850.575 | 3.4 | 1,701.15 | 3.4 |
| Dean Terrill | 510.525 | 2.04 | 510.525 | 2.04 | 1,021.05 | 2.04 |
| R. S. Kerr, trustee | | | 7,350 | 29.4 | 14,700 | 29.4 |
| D. A. McGee, trustee | | | 918.75 | 3.67 | 1,837.5 | 3.67 |
| T. M. Kerr, trustee | | | 850 | 3.4 | 1,700 | 3.4 |
| Total shares outstanding | 25,000 | 100 | 25,000 | 100 | 50,000 | 100 |

On April 18, 1948, and December 22, 1949, the directors of petitioner were:

| 4/18/48 | 12/22/49 |
|---|---|
| Robert S. Kerr | Robert S. Kerr |
| D.A. McGee | D.A. McGee |
| T.M. Kerr | T.M. Kerr |
| T.W. Fentem | T.W. Fentem |
| Dean Terrill | Dean Terrill |
| F.C. Love | F.C. Love |
| | Don L. Collins |
| | J.H. Lollar, Jr. |
| | H.B. Catlow |

After its organization Kermac entered into negotiations to purchase from the Republic Steel Corp. (hereinafter Republic Steel), the sole shareholder of a company then known as Republic Supply Co. which was organized under the laws of Texas, substantially all of the assets of Republic Supply Co. Kermac also entered into negotiations with the First National Bank of Chicago (hereinafter the bank) to arrange for a loan to finance the acquisition.

On April 16, 1948, Kermac and Republic Supply Co. (Texas) executed a purchase agreement which provided for the sale of those assets that Kermac wished to acquire. The transaction was closed on April 19, 1948, and Kermac on this date adopted the appropriate resolution to effect the change in the corporate name to Republic Supply Co. (Delaware). On April 22, 1948, petitioner's board of directors was advised that the acquisition

---

[1] As of Apr. 12, 1948, one or more of the shareholders who controlled petitioner also owned control of Kerr-McGee Oil Industries, Inc.

had been completed, the corporation's name had been changed, and that the corporation was actively conducting business.

To finance the acquisition Kermac applied to the bank for a loan of $11,500,000 which it received on or about April 16, 1948. Under the terms of the loan agreement the principal amount of the loan was divided into an A loan and a B loan. The former was to be in the amount of $6 million and the latter was itself divided into two portions in amounts of $1,375,000 [2] and $4,125,000. Repayment of the funds provided by the B loan was subordinated to the repayment of the A loan.

Kermac agreed to execute three promissory notes in the above amounts in the bank's behalf with the B loan notes being due in 5 years. Phillips Petroleum Co. (hereinafter Phillips) agreed to guarantee unconditionally the prompt payment of the $4,125,000 portion of the B loan (hereinafter the Phillips loan). Kermac also covenanted that the proceeds of these loans were to be used to acquire the assets of Republic Supply Co. (Texas) and for additional working capital.

Phillips caused the loan to be advanced to Kermac under the following circumstances. After Kermac was organized and as it was negotiating with Republic Supply Co. (Texas), it entered into contracts with other concerns to assure adequate supplies for its prospective business. Kermac then agreed to sell, and Phillips agreed to buy, certain fixed amounts of oil field tubular products, and petitioner further agreed to apply 50 percent of its gross profit on such sales towards the repayment of the Phillips loan. These payments were to be made by petitioner to either the bank or Phillips.[3]

Tascosa Gas Co. (hereinafter Tascosa) was incorporated under the laws of Delaware on December 6, 1949. It was authorized to issue 1,000 shares with a par value of $10. The aggregate number of its allotted shares was 500 shares of common stock with a par value of $10 per share. On December 22, 1949, said common stock was owned as follows:

---

[2] This portion of the B loan was guaranteed by Kerr-McGee Oil Industries, Inc.

[3] As part of the agreement between petitioner and Phillips it was agreed that "as between the parties, the primary obligation prior to 20 years from the date to repay said advance or loan of $4,125,000 other than by the repayments herein provided shall be that of Phillips and not that of Kermac."

This action by Phillips was authorized at an executive committee meeting at which the entire transaction was discussed and the repayment of this sum was termed as "a direct obligation of Phillips."

| Shareholder | Number of shares | Percent of shares |
|---|---|---|
| Robert S. Kerr | 125 | 25 |
| Robert S. Kerr, trustee | 147 | 29.4 |
| D. A. McGee | 143.375 | 28.68 |
| D. A. McGee, trustee | 18.375 | 3.67 |
| T. M. Kerr | 17.028 | 3.41 |
| T. M. Kerr, trustee | 17 | 3.4 |
| F. C. Love | 5 | 1 |
| Dean Terrill | 10.21 | 2.04 |
| T. W. Fentem | 17.012 | 3.4 |
| Total shares outstanding | 500 | 100 |

The principal officers and directors of Tascosa on December 16, 1969, were:

| Position | Individual |
|---|---|
| President | D. A. McGee |
| Secretary | Dean Terrill |
| Treasurer | T. W. Fentem |
| Director | F. C. Love |
| Director | T. M. Kerr |
| Director | Robert S. Kerr |

Soon after it was organized Tascosa applied to the bank and the Prudential Insurance Co. of America (hereinafter Prudential) for a loan of $7,128,000. In the loan agreement Tascosa stated that $4,125,000 of these funds would be loaned to petitioner (hereinafter the Tascosa loan)[4] and that the remainder would be used for its business purposes. Tascosa's business was the drilling, testing, and equipping of wells that were to be drilled pursuant to certain gas rights that Tascosa was to acquire, and which were subsequently acquired from Phillips.

The loan agreement was approved and Tascosa received the funds it requested on or about December 22, 1949. Tascosa effected the Tascosa loan by transferring the funds into petitioner's checking account with the bank. With respect to this amount, a credit to an account entitled "Notes Payable-Tascosa" was made on petitioner's books.

Petitioner then used these funds and an additional $802.08 to repay the Phillips loan. Petitioner's note for $4,125,000 to the bank, which was guaranteed by Phillips, was marked "paid" and "cancelled" by the bank and was returned to petitioner.

---

[4] Use of this phrase does not necessarily connote a finding of law, but is used for narrative purposes only.

These events that transpired in December 1949 were all prescribed by contracts and agreements that were entered into between petitioner, Phillips, and Tascosa. These documents which established certain rights and obligations between these parties will hereinafter be referred to as the agreement, the Republic contract, the obligation, the gas purchase contract, and the assignment and agreement. Prior to the execution of these agreements Phillips and Kerr-McGee Oil Industries, Inc. (hereinafter Kerr-McGee), had negotiations with respect to a transaction very similar to the one concluded by the above parties in December 1949.[5]

Under the terms of the assignment and agreement Phillips conveyed to Tascosa its interest in the dry gas rights under specified oil and gas leases. Phillips, however, reserved to itself an overriding royalty of 16 percent of the dry gas produced on these properties prior to the time that these properties "paid out" and 48 percent after that event occurred.[6] Tascosa agreed to develop the assigned properties at its own risk and expense.

Under the terms of the gas purchase contract Phillips agreed to purchase, at a specified price, all of the natural gas produced by Tascosa from the above-conveyed properties except for the amounts needed to fulfill Phillips' reserved royalty interest and

---

[5] The above conclusion is evident from the following portion of the minutes of the July 26, 1949, meeting of the executive committee of Phillips Petroleum Co.:

"In order to relieve Phillips of this obligation, [the Phillips loan] it is proposed, and negotiations are now in progress by which Phillips will assign to Kerr-McGee certain gas acreage located in the Panhandle and Hugoton Fields, and Kerr-McGee will agree to drill thereupon 100 wells, and will assume and pay at once the $4,125,000 note of [petitioner]. Kerr-McGee will drill these 100 wells without cost to Phillips. In order to accomplish this, Kerr-McGee *proposes to borrow $7,125,000 at 4% interest for 15 years.* Kerr-McGee will retain 81% of the income from the sale of gas from the wells to cover the repayment of the entire amount of borrowed capital plus interest and income taxes, and its share of the operating expenses. Phillips will receive the remainder, or 19% of the income and will pay its proportionate share of the cost of operating the 100 wells. It is assumed that this division of the income *will return to Kerr-McGee the $4,125,000 note obligation and the cost of development of the properties within 15 years.*

"If and when Kerr-McGee has been reimbursed to this extent, the proportionate interests in the 100 gas wells shall be revised and Phillips shall receive at least $5/8$ of the net income and Kerr-McGee $3/8$ thereof. The estimated ultimate life of the properties is 35 years and the proposed plan of financing and development is estimated to repay Kerr-McGee its entire investment and the $4,125,000 Republic Supply Company note and an additional profit of $2,422,000, and to return to Phillips a profit of $8,000,000 over the same period."

[Emphasis added.]

[6] These properties would be "paid out" when Tascosa repaid its loan and it received funds equal to the amounts needed, in excess of the funds provided by the loan, to operate and maintain the properties. The properties were "paid out" as that term was defined during November 1965.

other minor amounts. Phillips was committed to supply certain amounts of natural gas to a pipeline company.

The Republic contract between Phillips and petitioner first acknowledged the Phillips loan, the parties' previous agreement in 1948, the Tascosa loan, and the use of the latter to satisfy the former. The contract then provided that, in consideration of the above events, petitioner agreed to sell to Phillips various amounts of oil field tubular products [7] for 20 years until January 1, 1970, beginning with the calendar year 1950, or until the properties received by Tascosa from Phillips were "paid out," whichever was later.

The Republic contract further provided that petitioner would remit one-half of its gross profit on such above sales to Tascosa "the first sums so received * * * to be applied by Tascosa to the payment of Tascosa's loan of $4,125,000 to [petitioner], which loan is evidenced by a debenture." The contract finally provided that it replaced the previous agreement which was hereby terminated.

The agreement between Tascosa and Phillips first acknowledged the assignment and agreement, the gas purchase contract, the Republic contract, and that Tascosa was negotiating for its loan from the bank and Prudential. The agreement then provided that Tascosa would make the Tascosa loan which was to be used to satisfy the Phillips loan. Tascosa also agreed to apply the amounts it was to receive from petitioner against the Tascosa loan and that, after the assigned properties had been "paid out," it would remit 48 percent of its receipts from petitioner to Phillips.

The agreement also established a schedule of expected minimum sales of gas to be made under the gas purchase contract and that, as payment towards such purchases, Phillips was to receive a credit equal to the amount that Tascosa was receiving from petitioner. The agreement closed with a statement that it was being "entered into as part of the transaction covered by this agreement and other instruments referred to [above] * * * and all thereof shall be construed together."

Under the terms of the obligation petitioner agreed to make the payments to Tascosa as provided in the Republic contract. The obligation further provided that:

---

[7] The Republic contract only provided for the maximum amounts that Phillips could purchase, but Phillips was under no obligation to purchase any products from petitioner.

It is a condition of this Obligation that [petitioner] is obligated to make payments to Tascosa hereunder or by reason of the Republic Contract only out of funds derived from 50% of the "gross profit" from said sales to Phillips by [petitioner] pursuant to the Republic Contract and that [petitioner] shall have no obligation to Tascosa under or by reason of or in connection with said loan of $4,125,000.00 and this Obligation evidencing the same except as stated in this instrument and that none of the assets of [petitioner] shall be in any way subjected to the obligation of this instrument except in conformity with the provisions hereof, and that from and after the 21st day of the month following the last month of the period of the Republic Contract, [petitioner] shall be discharged, automatically without the necessity of any act or writing of or from any person, from any and all liability and obligation of any kind or character to Tascosa, its successors, assigns and representatives with respect to said loan of $4,125,000.00 and under or by reason of this Obligation except for obligations or liabilities of [petitioner] under this Obligation accrued prior to said date and not satisfied or discharged.

Having modified their relationships as established in April 1948, petitioner, Kerr-McGee, and the bank executed an agreement to modify the 1948 loan agreement. This document first acknowledged the terms of petitioner's earlier loan, that the Phillips loan had been satisfied by the Tascosa loan, and that the obligation had been executed to evidence the Tascosa loan. In consideration of these events petitioner's loan agreement was modified to remove all references to the Phillips loan and to make the now amended loan agreement subject to the Republic contract and the obligation.

Shortly after these agreements were signed F. C. Love (hereinafter Love), a shareholder and director of petitioner and Tascosa, sent a letter to petitioner's president in which he enclosed documents that related to this transaction. Included was the obligation which Love referred to as being "issued in exchange for and as evidence of a loan in the amount of $4,125,000 made by [Tascosa] to [petitioner]." A copy of petitioner's balance sheet for the period ended December 31, 1949, reveals that the Tascosa loan was reported by petitioner as a note payable in the long-term debt section of that report.

In January 1950 Love forwarded to petitioner's secretary-treasurer the legal opinion of a law firm located in Chicago, Ill., with respect to the transaction between petitioner, Tascosa, and Phillips. After reviewing the facts, which included the recognition of the common ownership of petitioner and Tascosa, it was their opinion that:

> No gain will be derived by either [petitioner] or TASCOSA upon the payment by TASCOSA to [petitioner] of the $4,125,000 and the execution by [petitioner] of its "Obligation", providing for the payment to TASCOSA of $4,125,000 pursuant to the terms of the said Obligation. This constitutes a loan by TASCOSA which [petitioner] is obligated to repay on the basis set out in its Obligation, and we have been informed that the parties contemplate that the 50% profit on sales made by [petitioner] to Phillips Petroleum Company will result in the payment of the full obligation in due course.

In accordance with the terms of the agreements petitioner began to account for its sales to Phillips. From at least 1955 petitioner carried the Tascosa loan in a notes payable account which reflected the payments made and the outstanding balance. A review of these amounts shows that 50 percent of the gross profit earned in one month was paid in the following month. This practice continued so that 50 percent of the gross profit earned in December 1969 was not paid to Tascosa until January 1970. All such payments were applied to principal.

In October 1958 petitioner's shareholders entered into an agreement to sell their stock to Republic Steel. One of the buyer's concerns was its prospective liability with respect to the existing and continuing Republic contract and the obligation. This agreement established that "the maximum amount to be paid prior to such termination [of the Republic contract] shall be one-half of the above-mentioned gross profits for each month from and after August 31, 1958 until the [petitioner] shall have so paid the sum of $2,112,553.34 [sic] and thereafter 24 percent of such gross profits for each month or portion thereof prior to such termination." The above figure represented the outstanding balance of the Tascosa loan as of the above date.

At the end of the Republic contract petitioner had paid to Tascosa $3,806,891.01 leaving an outstanding balance of $318,108.99. To reflect the termination of the Republic contract petitioner recorded a journal entry dated December 31, 1969, in which it debited the Tascosa loan account for $318,108.99 (thereby reducing it to zero) and credited profit and loss (current year) for a like amount. The accompanying explanation to this entry reveals that this amount represented a special credit to the profit and loss account after taxes.

Petitioner reported this amount on its 1969 tax return in Schedule M-2 Analysis of Unappropriated Retained Earnings Per Books as an increase to retained earnings caused by a

"Forgiveness of contingent liability on note payable." Respondent in his deficiency notice included the $318,108.99 in income for 1969 as follows:

(a) It is determined that upon expiration of the terms of an agreement entered into with Tascosa Gas Company you realized income in the amount of $318,108.99 computed as follows:

| | |
|---|---:|
| Value received under the terms of the agreement _____ | $4,125,000.00 |
| Consideration paid _____ | 3,806,891.01 |
| Income realized _____ | 318,108.99 |

Therefore, your taxable income is increased by $318,108.99.

We believe this case presents for our primary consideration the oft-litigated problem of whether money advanced to a taxpayer represents a debt or equity investment. In this instance the petitioner has chosen the equity side of this controversy as that position avoids the recognition of ordinary income under section 61(a)(12) by reason of the fact that a portion of the funds advanced will not be repaid. Although the issue is presented in a somewhat different manner, our analysis, using the applicable legal principles, will not be altered. *Ragland Investment Co.,* 52 T.C. 867, 875 (1969), affd. per curiam 435 F.2d 118 (6th Cir. 1970).

If any point in this area is settled it is that no particular set of standards can be uniformly applied. Although a variety of related, relevant factors have been established, it is clear that no one element is determinative and that it is the individual factual pattern of each case, which obviously differs, that brings forth those elements on which the ultimate conclusion is based. Sec. 385; *John Kelley Co. v. Commissioner,* 326 U.S. 521 (1946); *Dillin v. United States,* 433 F.2d 1097, 1100 (5th Cir. 1970); *Litton Business Systems, Inc.,* 61 T.C. 367, 376 (1973).

We also believe that our task is further complicated by the unique and complex nature of the transactions entered into between Phillips, Tascosa, and petitioner, and to some extent Kerr-McGee. The facts in this case have been fully stipulated. We have made every effort to get the flavor of the involved transactions from the dry legal phrases of the stipulated documents. We also might add that respondent's clear disavowal that the Tascosa loan does not represent debt had caused us to pause before embarking on our course.

In 1948 Kermac was organized to acquire Republic Supply Co.'s (Texas) operating assets, adopt its name, and pursue its existing business. The necessary funds needed to finance this project were borrowed from the bank. It is the $4,125,000 portion of the B loan (the Phillips loan) that ultimately spawned the Tascosa loan and the current controversy. Petitioner executed three promissory notes to evidence the bank loan including one for the Phillips loan.

Under the terms of the loan agreement between the bank and petitioner, Phillips agreed to guarantee the Phillips loan. Pursuant to this guarantee petitioner and Phillips entered into an agreement. Under its terms Phillips agreed to purchase from petitioner a certain amount of its oil field products and petitioner agreed to apply 50 percent of its gross profits from these sales towards the repayment of the Phillips loan. Phillips also agreed that for the first 20 years it would bear the primary obligation to repay the Phillips loan.

The following year Phillips and Kerr-McGee entered into negotiations with a view to Phillips securing a release from its obligations under the Phillips loan and the accompanying agreement and also having certain of its gas fields developed. An agreement between Phillips and Kerr-McGee never materialized but the substance of their negotiations was reflected in the subsequent agreements between petitioner, Tascosa, and Phillips which were described and referred to previously as the agreement, the Republic contract, the obligation, the gas purchase contract, and the assignment and agreement.

Under the terms of these agreements Tascosa acquired from Phillips, as a farm-out, certain gas properties and assumed the responsibility of developing them. Phillips retained an overriding royalty and agreed to purchase a minimum amount of the gas eventually produced over a period of years. Tascosa also agreed to make the Tascosa loan which petitioner was to use to satisfy the Phillips loan thereby releasing Phillips of its obligations in that respect. To finance its obligations Tascosa received a loan from the bank and Prudential covered by a loan agreement in which Tascosa's use of the loan proceeds was acknowledged.

Petitioner and Phillips entered into an agreement, which terminated their earlier agreement, under which Phillips agreed to purchase oil field products from petitioner, but no longer in any minimum amount, and petitioner agreed to remit 50 percent

of its gross profit from such sales to Tascosa in payment of the Tascosa loan. This contract was to last for 20 years or until the gas properties received by Tascosa from Phillips "paid out," whichever was later.

Petitioner acknowledged the receipt of the Tascosa loan and evidenced its intention to make the above payments to Tascosa but solely based on the gross profit it realized from those sales to Phillips. Tascosa also agreed that it would credit Phillips' gas purchase account in an amount equal to the amount it was receiving from petitioner and that, after the gas properties "paid out," it would remit to Phillips 48 percent of petitioner's payments to it. It was further provided that these agreements were entered into in consideration of one another and that they were to be construed together.

Petitioner's primary position is that the funds advanced to petitioner by Tascosa should hereinafter be referred to as the Tascosa equity in lieu of the Tascosa loan. By so doing, petitioner asserts that the $318,108.99, that remained unpaid when petitioner's obligations under Republic contract terminated, represents a contribution to petitioner's capital which is excludable from gross income under section 118 and not a discharge of indebtedness which would be includable in gross income under section 61(a)(12).

Respondent's position is that petitioner should have properly treated the receipt of the $4,125,000 as income in 1949 and its periodic payments to Tascosa as a deductible expense incurred to produce this income. However, respondent continues, petitioner has treated this transaction as a loan and such treatment constitutes a method of accounting pursuant to section 446 which cannot now be changed without respondent's consent. Using petitioner's method respondent asserts that the $318,108.99 represents income to petitioner when its obligation to make any further payments was extinguished.

Thus, respondent in a roundabout fashion ultimately concludes that the Tascosa loan should be treated as debt, the release of which represents income to petitioner. However, we do not believe that his analysis is proper because we do not agree that the characterization and treatment of the transaction in issue represents an accounting method. Sec. 1.446-1(e)(2)(ii)(b), Income Tax Regs. Rather we believe that our ultimate conclusion must rest on a determination of what might be termed

the merits of whether the Tascosa loan represents a debt or equity investment.

Petitioner has taken the position that due to nonexistence of several factors commonly associated with a debt instrument the Tascosa loan must be considered an equity investment. These factors which petitioner has documented in his brief as being relevant include:

(1) No written unconditional obligation to pay a fixed amount on a fixed date;

(2) No provision for interest;

(3) Subordination of the Tascosa loan to other creditors;

(4) A high debt-equity ratio;

(5) Use of the Tascosa loan to acquire capital assets;

(6) Identity of shareholder interest in petitioner and Tascosa;

(7) Lack of collateral;

(8) Inability to obtain a similar loan from an unrelated lender; and

(9) Lack of an acceleration clause.

Petitioner's argument also includes a discussion of those factors that indicate the existence of debt which include the accounting treatment accorded to the transaction, the payment history, and the existence of the prior Phillips loan.

Although petitioner's attention to these factors has been complete and proper, we believe that it has failed to relate them to the transaction as a whole in an attempt to explain its nature, purpose, and/or extent. In *Litton Business Systems, Inc., supra* at 377, we said:

> In view of the many decided cases in this area, we think the determinative question, to which an evaluation of the various independent factors should ultimately point, is as follows: Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?

After a review of the entire factual pattern of this case in this context, we believe that each part of the above question should be answered in the affirmative.

Our starting point is petitioner's creation and the Phillips loan. Petitioner was incorporated with only a minor amount of equity capital. It needed the entire amount of the bank loan to acquire the necessary operating assets. The note petitioner executed to the bank to evidence the Phillips loan indicated that repayment

was to be made in 5 years with interest at 3½ percent and that it was guaranteed by Phillips.

Petitioner argues that this arrangement effectively conveyed an equity interest in petitioner to Phillips in the nature of preferred stock. It points to the agreement between petitioner and Phillips whereby the latter assumed the primary responsibility for the Phillips loan, the latter's right to direct the payments made by petitioner, the source and contingent nature of the repayments, and several of the other factors mentioned above. Petitioner's purpose in making this seemingly premature argument is that the Tascosa loan can then be viewed as the substitution of one equity interest for another. We do not believe that the Phillips loan represents an equity investment by Phillips.

In connection with its incorporation petitioner applied for and received a loan from the bank. Petitioner executed notes in its name to evidence the loan. It seems that these funds were advanced to petitioner by the bank with the latter expecting the former to make the repayments. Further, Phillips is not included in the stipulated list of petitioner's shareholders.

We do not believe that Phillips' guarantee or the terms of the agreement between petitioner and Phillips whereby Phillips assumed primary responsibility for repayment should change our conclusion. The agreement between petitioner and Phillips was just that, which had no effect on the bank's rights. The fact that Phillips could direct the payments by petitioner either to it or the bank seems irrelevant.

As noted above one of the points of our inquiry is whether there was a reasonable expectation of repayment. We agree that the source and method of repayment belies the existence of debt, but we believe the above criteria has been met. Under the terms of their agreement Phillips was to purchase a fixed amount of petitioner's goods with 50 percent of the gross profits on such sales to be applied towards the satisfaction of the loan. Although not made a part of the record, we can only believe that projections were made which led the bank to believe that there was an adequate source of funds for repayment.

When Phillips and Kerr-McGee conducted their negotiations they estimated that the latter's investment would be returned in approximately 15 years. As will be discussed later their proposed transaction was substantially the same as the one in issue and

that the gas properties Tascosa received did "pay out" in approximately 15 years. This leads us to believe that financial projections of this transaction could be made and that they could be accurate.

Further, we find that the projections were demonstrably realistic. Petitioner was paying more than $11 million for the operating assets of an existing company that produced a marketable product. Petitioner had entered into other contracts to assure itself of supplies. This was not a situation where additional funds were needed to finance a speculative or untested venture. We also believe that these factors reduce much of the force behind the effect of the high debt-equity ratio.

In addition to providing for repayment of the Tascosa loan, we also believe that the agreements between the parties provided for interest payments. Petitioner's obligation to make its payments to Tascosa was to last for 20 years or until the gas properties "paid out," whichever was longer. The parties estimated that the properties would "pay out" in 15 years. The fact that the properties "paid out" meant that Tascosa's investment had been recovered, which included the funds that constituted the principal portion of the Tascosa loan. Yet it was provided that the petitioner would be required to continue to make repayments on the Tascosa loan for another 5 years. We find these payments, in effect, represented interest on the Tascosa loan.

Not only did the agreement provide for a source of repayment, but clearly it provided for a definite repayment schedule. It certainly appears that Phillips' guarantee was a decisive factor, but we cannot believe that either the bank or Phillips expected or intended that the latter, under normal circumstances, would be called on its guarantee.

The next year, in the middle of 1949, the negotiations alluded to previously between Phillips and Kerr-McGee occurred. Although these parties never reached any agreement the substance of their negotiations served as the basis and set the tone for the transaction in issue.

Tascosa was organized in late 1949 and was owned by the same interests and in the same proportions as petitioner. It has been stipulated that petitioner's shareholders held a strong interest in Kerr-McGee. We can only believe that Tascosa was organized by Kerr-McGee interests to take its place in the prospective transaction with Phillips.

In this context we believe that the summary of the negotiations as recorded by Phillips' executive committee as set out in footnote 5, *supra,* provides us with some insight to the transaction. The summary indicates that Kerr-McGee was to borrow the necessary funds (the funds that Tascosa subsequently borrowed) and use them to satisfy the Phillips loan (the Tascosa loan was used by petitioner to satisfy the Phillips loan) and develop gas properties it was to receive from Phillips (Tascosa did acquire the gas properties from Phillips to develop).

The summary also indicates that it was expected that Kerr-McGee would recover its investment plus other costs in approximately 15 years. The source of this recovery was the retention of 81 percent of the gas sale income with Phillips receiving the remainder. The negotiations also provided for an increase in Phillips' share of the gas sale income after Kerr-McGee recovered its costs including the $4,125,000 it was using to satisfy the Phillips loan.

As detailed in the initial phase of this opinion and as later summarized, this is effectively the transaction entered into between Phillips, Tascosa, and petitioner. Although the figures used and the source of the "pay out" are somewhat different, we note that the estimated "pay out" period of the Phillips-Kerr-McGee transaction closely approximates the actual "pay out" period of the transaction in issue.

It is apparent that one of the effects of the transaction in issue was to shift the guarantee obligation of the Phillips loan from Phillips to Tascosa. Having determined that the Phillips loan represented a debt transaction we conclude that the Tascosa loan which was an integral part of the entire transaction must be accorded the same treatment.

Petitioner argues that the prospects of repayment of the Tascosa loan were even more contingent than the repayment of the Phillips loan because Phillips now was not required to purchase any products from petitioner which was to produce the source of the payments petitioner would make to Tascosa. However we find that the effect of the agreements merely shifted Phillips' obligation from buying oil field products from petitioner to buying gas from Tascosa leaving the parties and the repayment prospects in essentially the same position.

Under the new agreements Phillips was required to purchase a minimum amount of gas from Tascosa and it was to receive a

credit from Tascosa equal to the amount received by Tascosa from petitioner. Clearly since Phillips was required to purchase the gas it was in its best interests to purchase petitioner's products. Further, after the gas properties "paid out" Phillips was to receive an additional payment from Tascosa and petitioner's payments to Tascosa were one of the sources from which the gas properties could be paid out.

When Tascosa applied for its loan, the bank and Prudential were aware of Tascosa's intention to make the Tascosa loan and that in large part their repayment prospects depended on the reality of the arrangement between petitioner, Tascosa, and Phillips. We can only believe that they were fully apprised of the facts and that they acted accordingly. See *Jack Daniel Distillery v. United States,* 180 Ct. Cl. 308, 379 F.2d 569, 580-585 (1967).

As noted earlier one of our points of inquiry is whether there was a genuine intention to create a debt. The intention of the parties is always a difficult factor to gauge and in this case we have only the recorded history of the contested events. However, every indication we have from the records points to the conclusion that the parties intended to create a debtor-creditor situation. We find this factor important and see no reason why petitioner should be lowered from the petard by which it has hoisted itself.

Petitioner applied for and received a loan from the bank for which it issued promissory notes. The note evidencing the Phillips loan was marked paid and returned to petitioner when the proceeds of the Tascosa loan were received and applied. Petitioner then entered into the obligation to evidence the Tascosa loan.

Petitioner argues that the clear language of the obligation limiting petitioner's repayment liability supports its position. This point is well taken but we have previously concluded that there were reasonable prospects for repayment thereby mitigating the effect of this language. Further, we have found that the obligation had been referred to in the accompanying agreements and by Love as representing evidence of the Tascosa loan.

Petitioner also received the legal opinion of a Chicago law firm which concluded that Tascosa had made a loan to petitioner. This conclusion was based on the representations made by the parties to the firm which included a copy of the obligation. We

also note that it was represented to the firm that the parties expected the Tascosa loan to be repaid in due course. We find the representations with respect to this transaction made by those involved and at the time the events transpired significant.

Petitioner's treatment of this transaction on its books and records also supports our conclusion. It is evident that from beginning to end the Tascosa loan was treated as a loan. Upon receipt of the funds a note payable account was established and the yearend balance in this account was reported in the liability section of its balance sheet. This account was reduced as the payments were made. When petitioner's repayment responsibilities were terminated the account was closed with a corresponding increase to retained earnings. This entry was reflected on petitioner's 1969 tax return as an increase to retained earnings after taxes with an accompanying explanation that the increase was due to a "forgiveness of a contingent liability on note payable."

We agree with petitioner's assertion that bookkeeping entries are not determinative, but in a highly complex arrangement which exhibits tendencies on both sides we believe that this factor takes an added importance. *Zilkha & Sons, Inc.,* 52 T.C. 607, 612-613 (1969). Further, we are hard pressed to sponsor petitioner's position when it appears that this stance has been adopted for the first time at this time.

Finally, we note that when petitioner's shareholders sold their stock to Republic Steel in 1958, petitioner's obligations under the various agreements were considered. There is no mention of a possible Tascosa equity interest and we believe it would be news to Republic Steel to discover that it had acquired a new equity partner in petitioner.

Petitioner has been quite thorough in the presentation of its argument. We have considered its points and the support therefor. It is our belief, however, that the whole of this case is more impressive than the individual parts, and that our reaction to the stipulated events reduces much of the force of some of these parts. It is our conclusion then that the Tascosa loan was a genuine debt, with reasonable prospects for repayment, and that the intention of the parties "comports with the economic reality of creating a debtor-creditor relationship." *Litton Business Systems, Inc., supra* at 377.

At the outset we noted that the nature of this question made reference to other cases difficult. However we are compelled to state that we have relied to some extent on the factual patterns and results of the following cases: *Byerlite Corp. v. Williams,* 286 F.2d 285 (6th Cir. 1960); *Litton Business Systems, Inc., supra; Jack Daniel Distillery v. United States, supra; American Processing & Sales Co. v. United States,* 178 Ct. Cl. 353, 371 F.2d 842 (1967).

Anticipating a possible finding that the Tascosa loan represented a debt instrument, petitioner has advanced alternative arguments in an attempt to avoid the effect of respondent's determination. Petitioner first points to the identity of petitioner's and Tascosa's shareholders and argues that effectively the debt was forgiven by petitioner's own shareholders which represents a contribution to capital which is excludable from petitioner's income. Sec. 1.61-12(a), Income Tax Regs. With this argument petitioner is asking us to ignore Tascosa's corporate vitality or to hold that Tascosa made the Tascosa loan for its shareholders' personal benefit. See *Rapid Electric Co.,* 61 T.C. 232 (1973); *James Kuper,* 61 T.C. 624 (1974), on appeal (5th Cir. Aug. 12, 1974).

Tascosa was organized to serve a definite purpose in this multisided transaction. It borrowed the necessary funds to fulfill its obligations which included making the Tascosa loan and developing the gas properties. The transaction was economically sound and Tascosa stood to, and from the record it appears that it did, earn a substantial return. Further, the Chicago law firm was aware of petitioner's and Tascosa's common ownership when it issued its opinion. We cannot now say that the integral part Tascosa played should be ignored or that it was not done for its own benefit.

Petitioner next argues that under the language of the obligation, petitioner's repayment liability was limited so that at the outset there existed the possibility that petitioner would not be required to repay the full amount. From this petitioner concludes that the forgiveness of indebtedness occurred when the obligation was executed in December 1949.

Although the face value language of the obligation supports petitioner's position we do not believe that it comports with the economic realities of the situation. As we have previously found the parties expected that the Tascosa loan would be fully repaid

from a realistic source of revenue. Further, the terms of the Republic contract, which is to be construed in conjunction with the obligation, tend to weaken petitioner's position.

The Republic contract provided that petitioner was to make its payments to Tascosa for 20 years or until the gas properties "paid out," whichever was longer. From the record it appears that the gas properties could only "pay out" from two sources—the proceeds received from Tascosa's gas sales to Phillips, and petitioner's payments. Although the parties contemplated that the "pay out" would occur in 15 years and that the Republic contract would consequently last 20 years, Tascosa was assured that, if difficulties arose with developing the gas properties adversely affecting this source of revenue, petitioner's payments would continue for as long as necessary (until the gas properties "paid out") to make up the difference. It does not appear that Tascosa was forgiving anything when it entered into the obligation with petitioner. Further, it could not have known, in 1949, how much to forgive.

Petitioner also points to the language of the obligation and argues that under its terms petitioner did not have to perform any additional acts to discharge the debt. In such a situation the effective date of the cancellation is the date the terms of the cancellation are established. In support of this contention petitioner has cited *United States v. Ingalls,* 399 F.2d 143 (5th Cir. 1968), and *Temple W. Seay,* T.C. Memo. 1974-305.

In both of these cases differences arose between the creditor and the debtor, with the former obliged to pay the latter for services rendered or to be rendered. The agreement reached by the parties provided that their opposing obligations would be used as offsets against each. The decisions hold that the agreements effected the cancellation of the indebtedness and that the income must be recognized at that time even though the actual mechanics of the agreement (debtor credited with the income which was then used to satisfy the debt) occurred over a period of years.

We believe the above situation is clearly distinguishable from the transaction in issue. As we have found, the obligation did not effect an immediate or prospective cancellation of the Tascosa loan. The agreements in the above cases represented a settlement of the respective disputes, whereas the obligation established the method by which the Tascosa loan would be repaid. We believe

the holdings of the above cases are inapplicable to the situation at hand.

Having determined that the cancellation of the Tascosa loan did not occur in December 1949, we must now consider petitioner's argument that it occurred in January 1970 rather than December 1969 and therefore not within the year noted in respondent's determination. For support petitioner relies on the terms of the Republic contract and the obligation.

When the gas properties "paid out" in November 1965 it was then known that the 20-year period would serve as the length of the Republic contract. Such period was described as encompassing "the calendar year 1950 and each year thereafter until January 1, 1970." Under the terms of the obligation petitioner was to make its payments to Tascosa on the 20th day of each month based on the preceding month's sales and petitioner's liability would be discharged "from and after the 21st day of the month [January 1970] following the last month [December 1969] of the period of the Republic Contract."

Petitioner admits that the Republic contract ended on December 31, 1969, but argues that petitioner was not discharged from its obligations until January 1970. We believe that petitioner's admission, which we find to be accurate, is fatal to its claim.

Petitioner as an accrual basis taxpayer must include items in income "when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy." Sec. 1.446-1(c)(1)(ii), Income Tax Regs. It is clear that the sales made in December 1969 were the last to be made under the Republic contract. By the end of the month all of the events had occurred and the outstanding balance of the Tascosa loan could be easily determined.

We do not attach much significance to the January 1970 payment. It represented the amount due Tascosa from the December 1969 sales made by petitioner to Phillips. There were no events (sales) that occurred in January 1970 that affected this payment. As such it was merely "the ministerial act of computation" which should have no effect on the timing of the recognition of income. *Judith Schneider,* 65 T.C. 18, 28 (1975).

We have found that the petitioner incurred a true indebtedness when it received the proceeds of the Tascosa loan. Upon receipt of the loan it entered into a series of agreements which provided for

the loan's repayment. Subsequently petitioner was relieved of its liability for less than the loan's full value. We believe this represents cancellation of indebtedness income which must be realized by the petitioner and which must be reported in 1969. Sec. 61(a)(12); *United States v. Kirby Lumber Co.,* 284 U.S. 1 (1931); *Helvering v. American Chicle Co.,* 291 U.S. 426 (1934).

*Decision will be entered under Rule 155.*